# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

SCOTT THOMAS ERSKINE,
Defendant and Appellant.

S127621

San Diego County Superior Court
SCD161640

May 23, 2019

Justice Liu authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

PEOPLE v. ERSKINE

S127621


Opinion of the Court by Liu, J.


Defendant Scott Thomas Erskine was sentenced to death in 2004 for the first degree murders of Charles Keever and Jonathan Sellers. This appeal is automatic. (Pen. Code, § 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

Erskine was charged with two counts of first degree murder and personal use of a deadly and dangerous weapon in the March 27, 1993 deaths of Charles Keever and Jonathan Sellers (referred to by the parties and herein as Charles and Jonathan). (Pen. Code, §§ 187, subd. (a), former § 12022, subd. (b).) With respect to Charles, Erskine was charged with the special circumstances that the murder was committed while engaged in the commission or attempted commission of the crimes of performance of a lewd and lascivious act upon a child under the age of 14 in violation of Penal Code section 288 and oral copulation in violation of former section 288a. (Pen. Code, § 190.2, subd. (a)(17)(E), (F).) With respect to Jonathan, Erskine was charged with the special circumstances that the murder was committed while engaged in the commission and attempted commission of the crime of the performance of a lewd and lascivious act upon a child under the age of 14 in violation of section 288. (Pen. Code, § 190.2, subd. (a)(17)(E), (18).) As to both counts, Erskine was further charged with the special circumstances that the murder was intentional and involved the

1

infliction of torture, and that he has in this proceeding been convicted of more than one offense of murder in the first or second degree. (*Id.*, § 190.2, subd. (a)(3), (18).)

Erskine pleaded not guilty to all allegations, and a jury trial commenced on August 29, 2003. Erskine did not present any evidence in defense. The jury found Erskine guilty of both counts of first degree murder and personal use of a deadly weapon, and found true each of the charged special circumstances. The jury deadlocked, however, at the penalty phase, and the court declared a mistrial. On retrial of the penalty phase, the second jury returned death verdicts on both counts. The court imposed a sentence of death on both counts and further imposed a determinate term of two years, comprised of a one-year term of enhancement on each count pursuant to former section 12022, subdivision (b) of the Penal Code, to be stayed pending execution of the death penalty.

## A. Guilt Phase

The morning of Saturday, March 27, 1993, nine-year-old Jonathan and thirteen-year-old Charles set out on a bike ride from which they never returned. Witnesses described seeing the two boys that morning at an arcade and pet adoption center, and at a Rally's hamburger stand where they purchased lunch. Two other witnesses spoke briefly with the boys while biking in the Otay riverbed near a washed out bridge. One of those witnesses also recalled seeing a man driving a car across the field and blocking the bike path, which "seemed very unusual." She identified a photograph of a blue Volvo used by Erskine at the time of the murders as similar in color and shape to the one she saw that day.

When the boys failed to return home that evening, their families began to search the neighborhood. Jonathan's brother told their mother about the riverbed trail where they liked to bike; he did not think to tell her about the "fort" in the riverbed that the boys would crawl into "like a little cave." He and his mother went to the trail but stopped short of the fort. It rained that night and the following day while people continued to search for Jonathan and Charles.

Two days later, Peter Winslow was biking and running on the path through the Otay riverbed when he stopped to look at a "camp-like thing" in the bushes. As he looked inside, he saw two boys, one hanging from a rope by his neck on a tree branch, one lying on the ground, and both naked from the waist down save for socks. Both boys appeared deceased.

Homicide Detective David Ayers described the "fort" where the bodies were found as an area approximately 10 feet wide, 12 feet long, and between five and six feet high, comprised of a trampled down floor covered with crushed tumbleweeds, a perimeter of tumbleweeds, and a canopy of castor bean plants that formed a partial roof over the structure. The entrance was a two-foot opening located approximately 12 feet along a small path leading from the main bike path.

Detective Ayers testified that Jonathan was found wearing a blue and white sweatshirt and socks but otherwise nude from the waist down. His body was suspended by a branch approximately three and a half feet above the ground via a rope tied around the neck, and with his knees and knuckles on the ground. A second rope was tied around his ankles, and there was a gag comprised of a towel and tape around his chin. Ayers

described adhesive marks on his cheeks where the gag had been attached at some point over his mouth.  Ayers also identified a white cord found lying free at the scene that appeared to have been previously attached to Jonathan's wrist.

Charles was found lying facedown, wearing a hooded sweatshirt and socks but also otherwise nude from the waist down.  The body had a yellow rope and a white cord around the neck, similar to those found on Jonathan.  Ayers described what appeared to be dried blood on Charles's genital area.  Unlike the rope on Jonathan's neck, which Ayers described as "somewhat loose," the rope and cord on Charles's neck were drawn up tight and the skin was swollen underneath.  Ayers also described tape residue and adhesive marks on Charles's cheeks.  Underneath Charles's head, officers found a pile of "neatly" folded clothing, including the boys' shirts, jeans, and shoes.

Other evidence collected at the crime scene included two cigarette butts on the path connecting the fort to the main bike path. The two boys' bicycles were found chained together and covered with tumbleweeds approximately 30 feet north of the fort.

Dr. John Eisele, the pathologist who reported to the scene and performed both autopsies, testified that the two boys had been dead for at least one day and possibly up to two or three days before the bodies were found.  His autopsy of Charles revealed evidence of premortem strangulation, injury to the anus consistent with penetration by a foreign object, and bruising and abrasions on the penis and scrotum.  Dr. Eisele testified that these injuries appeared to have occurred while Charles was still alive and would have been painful.  Dr. Eisele

concluded that the cause of death for Charles was asphyxia consistent with ligature strangulations, which he testified could have taken as long as five minutes.

The autopsy of Jonathan also revealed evidence of strangulation. Dr. Eisele described two different ligature marks on the neck: The first was accompanied by small vertical scratches consistent with a person trying to pull the ligature off his neck. The second was much darker and deeper because it resulted from the force of the top half of the body being suspended from the ligature from the time of death until the body was found. Dr. Eisele concluded that the cause of death for Jonathan was asphyxia consistent with ligature strangulation.

The police collected sexual assault swabs from both bodies. An initial analysis in April 1993 revealed a single sperm cell from a swab of the skin on Jonathan's scrotum but did not yield any other material inconsistent with the victims. A subsequent analysis in 2001 using more advanced differential extraction revealed sperm samples on the scrotum and anal exterior swab from Jonathan, and the oral swab from Charles. Profiles of the sperm samples were transmitted to California's Department of Justice for a search against Combined DNA Information System, which returned a match to a known sample from Erskine. Further analysis by the San Diego crime lab, and confirmed by an outside analyst, concluded that Erskine was very likely the source of the predominant DNA from the sperm fraction of the oral swab sample from Charles and the epithelial sample from one of the cigarette butts found at the scene.

In March of 1993, Erskine was living in San Diego. His roommate, Lori Behrens, confirmed that Erskine carried a four-

to five-inch buck knife at that time, smoked, and drove two different cars, one of which was an older model blue Volvo consistent with the description of the car observed at the crime scene the day the boys disappeared. She testified that she and Erskine had at times visited his mother's home in Imperial Beach and a nearby bar — locations that were approximately two and a half and two miles from the crime scene, respectively.

Evidence of two other crimes was introduced: the October 1993 sexual assault of Jennifer M. in San Diego and the June 1989 sexual assault and murder of Renee Baker. This evidence is discussed below.

Erskine did not offer any evidence in defense at the guilt phase.

## B. Penalty Phase

### 1. Prosecution Evidence

After the first jury hung at the penalty phase, the prosecutor presented a second penalty phase jury with the same evidence regarding the circumstances of the crime as was presented at the guilt phase. In addition, the prosecutor presented the following evidence of other criminal activity involving force or violence and evidence of victim impact.

#### a. Criminal Activity Involving Force or Violence

Erskine's younger sister, Judy C., testified that on more than one occasion when she was seven years old and Erskine was ten, Erskine and two of his friends took Judy C. and her friends of a similar age to the loft of the barn behind their home and forced the girls through threats or blackmail to perform oral copulation. Approximately four years later, when she was 11

years old, she woke up during the night to find Erskine touching her breasts and vagina.

Barbara G. met Erskine when she became friends with his sister, Judy C., in the fifth grade. In March or April of that year, Erskine invited her to see a fort he made, which Barbara described as "like an igloo" built out of foliage, with an entrance that you had to crawl through. Once inside the fort, Erskine threatened her with a knife, pulled off her shorts and underpants, penetrated her vagina and anus with his finger and then with sticks or twigs, and then forced her to orally copulate him.

Randi C. testified that Erskine was her boyfriend when she was 11 or 12 years old. One day, Erskine asked Randi to "prove [her] love to him" by having sex. When she said no, Erskine hit her on the side of her head with a closed hand, hard enough to make her stagger back.

Colleen L. testified that in 1978, when she was 12 years old and Erskine was 15, Erskine was walking her home when put a knife to her throat and forced her into a drainage ditch. He forced her to take off their clothes and to orally copulate him; he sodomized her, again made her orally copulate him, and then vaginally raped her. Afterward, he walked her home, still holding his knife to her neck.

V.M. testified that on the day after Colleen L. was attacked, she went for a morning jog in the same area. A man whom she later identified as Erskine tapped her on the back, pointed a knife at her abdomen, and then pulled her toward the drainage ditch. She escaped, and Erskine was arrested.

Robert M. was 14 years old in June 1980 when Erskine approached him outside of his school, asking where the restroom was. As they walked behind the main school building on the way to the restroom, Erskine became "very angry" and pushed Robert against the wall. Erskine violently threatened Robert with sexual assault, slapped his penis, and punched him in the face "over 20" times. He then sat on top of Robert and choked him until he passed out. Robert woke up to see Erskine shaking him and asking if he was all right, "as though he had just found" Robert. Erskine was arrested at the scene.

Michael A. was arrested in January 1981 and placed in a holding cell where he encountered Erskine, whom he described as "running the cell" and as "the shot caller." Following a dispute about purchasing items from the commissary, Erskine hit Michael in the face, knocking him down. Erskine then ordered Michael to orally copulate him and two other men, or he would have all of the men in the cell assault Michael. When Michael refused, Erskine "went into a frenzy," slamming Michael's head into the concrete. Michael complied with Erskine's demand. A guard saw what was happening and brought Michael out of the cell. Michael identified the perpetrator as Erskine.

Deborah Erskine met Erskine in 1988 when he was working at her brother's flower and fireworks stand in Palm Beach, Florida. They began dating and soon married. Their arguments occasionally became physical, and Erskine hit her. When Deborah was six months pregnant, Erskine choked her and kicked her in the stomach. Erskine then chased Deborah down the street, yelling that he had a gun.

Erskine's younger brother, Douglas, testified about multiple physical altercations with Erskine as adults. In April 1992, Erskine threatened Douglas with a broken pool cue during an argument at their mother's home; Douglas grabbed the pool cue and beat Erskine "pretty bad." During the next incident, Erskine choked Douglas to the point that he passed out and lost control of his bladder and bowels. Then, in December of 1992, the two men got into a fight; after Douglas hit Erskine, Erskine ran outside to his car and took out a rifle, loaded it, and pointed it at Douglas, saying, " 'This is for you, Doug.' "

Phillis Serrano worked with Erskine at a car moving company in the early 1990s. She and Erskine began dating during this time, and he moved into her home in January or February of 1993. On March 11, 1993, she and Erskine had their first and only physical altercation during which Erskine pulled the phone out of the wall and then put his hands around Serrano's neck, making it difficult for her to breathe. He was arrested but never charged. Serrano later married Erskine.

b. Victim Impact Evidence

Jonathan's mother, Milene Sellers, described giving Jonathan a kiss and telling him "bye" when he left with Charles for their bike ride on March 27, 1993. She described her struggle to continue taking care of herself and her children after Jonathan's death. Jonathan's twin sister, Jennifer Sellers, recalled her mother screaming and falling on the floor when the police came to the house to say they found the bodies. She testified that she felt alone going through life without her twin and that every birthday was "like a memorial day for my brother."

Charles's mother, Maria Keever, described going down to the crime scene "for years and years." She testified that she had been "consumed" with finding her son's killer; at some point, she bought a gun and went down to the crime scene because she "wanted to die at the same place [her] son died." She called the police "every day[,] sometimes twice a day," for eight years. Charles's sister talked about the billboards the family purchased, her mother's visits to psychics, and other efforts to find the perpetrator — efforts that she said "just took over" her mother's life. Charles's older brother was in the military, stationed in New York, when Charles died. He went home to be with his family and to bury his brother, but said he would never come back to live in San Diego, where there are "too many bad memories."

### 2. Defense Evidence

Erskine's mother, Rita Erskine, described his father, Don, as "sex crazy," adding, "I hated it, but . . . he said it was my duty as his wife." According to Rita, Don would spank her in front of the children but did not otherwise hit her when the children were young. Later, Don began punching Rita and throwing her around in the home, usually after the two of them had been drinking. Judy C. testified that she saw her father touch her mother "in a sexual manner" in front of the children "once or twice" when he had been drinking; he would also make sexual comments to their mother when drinking. When Judy asked her mother about it, her mother said, "That's what you get for drinking."

Douglas denied that Don was ever physically abusive to him or Erskine as children or that Don ever "beat" their mother.

But Douglas recounted an incident when he was 15 years old, during which Don choked Erskine after Erskine intervened in an argument between Douglas and Don. He further testified that on three or four occasions, his father punished the three younger children by linking them up and then "spanking" them with a belt 12 times each, and that there were times when his father would hit his mother while she was on the floor.

When Erskine was five years old, he was hit by a car while attempting to cross the four-lane Pacific Coast Highway with his older sister. Hospital records showed that Erskine's left femur, pelvis, and several ribs were fractured in the accident; he had lacerations on his face and elbow; and he had bruising in his lung and brain tissue. He spent six weeks in the hospital. Rita testified that Erskine began experiencing "violent headaches" after the accident, during which he would scream and bang his head on the wall. He began having sudden temper tantrums, hitting and pushing his brother with no warning. He started kindergarten the next fall but had trouble with muscle control and fine motor skills.

Dr. James Grisolia, an expert in head trauma, reviewed Erskine's hospital records and offered his opinion that Erskine had suffered a mild to moderate head injury and that any bleeding in the brain was mild to moderate only. It was significant to Dr. Grisolia, however, that Erskine sustained this injury as a child because many of the brain's areas, including those relating to emotional reactions and understanding of others, had not yet developed and connected into the rest of the brain. He testified that such an injury could result in lasting dysfunction or ongoing signs of brain damage and could even

cause someone to become a sociopath, but the effects of head injuries would express themselves on a "continuum" and could be present either all of the time or situationally.

By the time Erskine was 10, psychiatrists had prescribed Erskine both Haldol and Ritalin because he was "out of control," according to Rita. But the medications were causing him to fall asleep at school, so Rita took him off them after two months. Around this time, Rita got a phone call reporting that Erskine and his friends had been taking Judy and other girls into the barn at the residence and "initiating them, taking off their clothes."

In 1975, at age 12, Erskine was placed in the Green Valley Ranch youth facility, where he was treated by Dr. Roy Resnikoff, who observed indications of organic brain dysfunction. Dr. Resnikoff noted that the family dynamic emphasized hostility and violence, and that Erskine would provoke the severe antagonism between his hostile father and "somewhat passive" mother to play the parents off against each other. Erskine's therapy ended abruptly some months later after his father removed him from the ranch. At that point, Dr. Resnikoff believed Erskine's prognosis was poor.

In May 1976, at age 13, Erskine was referred by the county mental health division to Southwood Hospital in Chula Vista, where he was hospitalized for approximately two weeks in a locked ward. He was treated by Dr. Allan Rabin, who diagnosed Erskine with dissociative neurosis, organic brain syndrome with a history of trauma, and borderline psychosis. Erskine was referred for psychological testing, which showed that Erskine had low-average intellectual functioning and significant

12

impairments in memory. Erskine was diagnosed at that time as having an impulsive personality and hyperkinesis secondary to organic brain damage, and was prescribed medication for hyperactivity, agitation, rage episodes, and mood stabilization.

Erskine was released from Southwood in June 1976 to his parents' custody but then readmitted by court order in July following another sexual assault. Dr. Rabin resumed his treatment of Erskine through September 1977 and shared with Erskine's defense lawyers at the time his diagnosis of neurotic tension discharge disorder, with no evidence of psychopathic personality; he did not indicate any evidence of brain damage or otherwise attribute Erskine's behavior to organic impairment. At the conclusion of his treatment, Dr. Rabin noted that Erskine was seriously disturbed with impaired judgment, reasoning, and empathy, and that he required long-term treatment.

In December 1977, Erskine went to live in New Hampshire with his aunt, Janet Erskine. Janet told Erskine that he would be sent back to California for bringing a girl to the home. Erskine responded by overdosing on Valium and was hospitalized for a few days before returning to California.

In April 1978, at age 15 and back in California, Erskine was arrested and later convicted for sexually assaulting Colleen L. and V.M., and sent to the California Youth Authority. An expert on the California Youth Authority described the conditions at that time to include a high level of violence, an absence of treatment for sexual predators, and a high overall level of recidivism for individuals following release. Erskine's records showed that he was found eligible for placement in a unit for the mentally ill, but was never admitted to that unit.

Upon his release, Erskine was placed on parole and sent to live in a foster home.  After six weeks, he left for a job at a residential camp; on the way to that job, Erskine was arrested for sexually assaulting Robert M.

Following that arrest, Erskine was evaluated for what at the time was referred to as a mentally disordered sex offender (MDSO) in relation to his criminal charges for the assault of Robert M.  (The MDSO statutes have since been repealed.)  An expert for the defense concluded that Erskine suffered from very severe conduct disorder, aggressive type, with evidence of sexual sadism — a condition which contributed to his predisposition to eruptive, explosive, aggressive, and violent sexual assaults — and on that basis offered his opinion that Erskine qualified as an MDSO who might benefit from a state hospital treatment program.  Two court-appointed psychiatrists from the county forensic department disagreed, and the trial court in 1981 ultimately concluded Erskine was not an MDSO.  At his sentencing, Rita told the judge, " 'Please give my boy some help.  Otherwise, he's going to kill somebody.' "  She hoped Erskine would be sent to a psychiatric hospital.  Instead, he was sentenced to four years in state prison.

While in custody in the San Diego County Jail and the Department of Corrections, Erskine was at various times diagnosed with personality disorder not otherwise specified, antisocial personality disorder, anxiety, and bipolar affective disorder and major depression, the latter two with paranoid and psychotic features, including hearing voices saying that people were out to get him.  While in custody, Erskine was prescribed medications to reduce his psychotic symptoms, alleviate his

depression, and help him to cope with anxiety, panic, and insomnia. He was never hospitalized for these conditions.

In 2003, an expert on educational and disability issues reviewed Erskine's records and met with him at the jail to measure his learning skills, attention, and memory. She measured his IQ as 88 and observed that he performed poorly on an attention test and tests with memory components.

Dr. Thomas Wegman, a psychologist with a board certification in neuropsychology, reviewed Erskine's records and interviewed him in March 2004 over the course of about eight hours on two days to perform a neurological assessment. Dr. Wegman found that Erskine had mildly impaired executive function with otherwise average intelligence, though he acknowledged that the facts of the charged crimes required some level of planning. He also noted that Erskine had total anosmia (loss of the sense of smell), which is associated with frontal lobe damage. Dr. Wegman agreed with the diagnosis of antisocial personality disorder with features of sexual sadism, which in his view was the result of brain injury as well as a "sick family environment," and that these factors combined to predispose Erskine to sexual predation but did not preclude him from knowing right from wrong. He noted that Erskine's tendency to minimize or make excuses for his behavior was "characteristic" for someone with antisocial personality disorder.

Dr. Judith Becker, a professor of psychology and psychiatry, met with Erskine in December 2002 and July 2003 to ascertain why he engaged in sexually violent behavior. Dr. Becker noted that Erskine exhibited several "risk factors,"

including the head injury he sustained as a child, a dysfunctional family environment that included his father's violence toward Erskine's mother and Erskine himself, prior diagnosis of and medication for attention deficit disorder, a history of running away, and early sexual behavior. Dr. Becker concluded that Erskine exhibited several mental disorders: intermittent explosive disorder, paraphilia of sexual sadism, paraphilia not otherwise specified, and antisocial personality disorder. She opined that Erskine acted out sexually in part because his sexual pathology started at an early age and went untreated, consistent with a lack of real treatment options for sex offenders in the 1970s. Dr. Becker identified a theme running through Erskine's crimes of selecting vulnerable victims, luring them away from the public, and gaining control of them using drugs, alcohol, or weapons. She testified that Erskine would have been sexually aroused by the pain and fear that he caused to Jonathan and Charles, but would nevertheless have known that what he was doing was wrong.

The parties stipulated that Erskine was arrested for the crimes against Jennifer M. on November 3, 1993, sentenced to 70 years for that crime, and has remained in custody continuously from that date. The parties further stipulated that no charges were filed and Erskine was never prosecuted for the 1981 sexual assault of Michael A., the 1992 arrest for possession of firearms by a felon, the 1992 assault with a firearm on Douglas, or the 1993 domestic violence incident against Serrano. The Department of Corrections had no records indicating that Erskine was written up, prosecuted, or disciplined for any act of violence, crime, assault, gang affiliation, weapon or drug

possession or transportation, or any act of aggression or intimidation.

### 3. *Rebuttal*

On rebuttal, Erskine's roommate at the time of the murders described him as "very smart" and confirmed that she never saw him act out in frustration or lose his temper with teachers or fellow students. She confirmed that Erskine understood general social norms, including right from wrong, and was able to conform his behavior to those standards even in stressful situations. A coworker at the time described Erskine as "controlling" and agreed with the prosecutor that he "liked to be in charge" and had "a quick wit." She never observed him to read social cues incorrectly, act inappropriately with coworkers, or "lose control."

Dr. David Griesemer, a professor of neurology with a specialty in pediatric neurology, met with Erskine to conduct a mental status examination, which revealed some difficulty with memory but no physical impairment on his cranial nerve exam, asymmetry between his right and left side, visual impairment, or evidence of spasticity or seizure activity. He found Erskine to be normal in terms of executive function and concluded that Erskine did not have any neurologic impairment that would force certain behavior or make him irresponsible for directing his behavior.

Sergeant Holmes returned to the stand on rebuttal to testify about his March 13, 2001, interview with Erskine. He described Erskine during that interview as "calm, fairly friendly and conversant." The prosecutor then played the tape of the interview.

Dr. Park Dietz reviewed Erskine's records and testified that he found four diagnoses proffered by Erskine's experts to be supported by evidence: attention deficit hyperactivity disorder, polysubstance abuse, sexual sadism, and antisocial personality disorder. He agreed that Erskine had experienced a number of factors associated with criminality, including evidence that Erskine had moved often as a child, suffered a significant head injury, experienced alcohol abuse by his parents, witnessed his father beat his mother, and experienced emotional and physical abuse as a child. Dr. Dietz disagreed with the diagnosis that Erskine suffered from intermittent explosive disorder and found no evidence that Erskine showed any symptom of mental disease at the time of his crimes. Neither sexual sadism nor antisocial personality disorder, according to Dr. Dietz, would impair an individual's volitional control over his or her actions.

## II. GUILT PHASE ISSUE

### Evidence of Other Crimes

#### 1. Background

Before trial, the prosecutor filed a motion in limine to admit evidence of 14 incidents of criminal activity involving force or violence, including those described above in the prosecution evidence on penalty. Over Erskine's objection, the trial court admitted evidence of two of these prior incidents — the sexual assault of Jennifer M. and the rape and murder of Renee Baker — under Evidence Code sections 1101, subdivision (b), and 1108 (all undesignated statutory references are to this code). During the presentation of this evidence, the trial court admonished the jury: "Evidence concerning the crimes

involving Jennifer M[.] and Renee Baker has been admitted. This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character." At the close of the case, the jurors were instructed with a modified version of CALJIC No. 2.50 regarding the proper consideration of "other-crimes" evidence in general and with CALJIC No. 2.50.01 regarding the proper consideration of evidence of other sexual offenses, as well as a pinpoint instruction regarding the evidence concerning Jennifer M. and Renee Baker. The court also instructed the jurors that the prosecution had the burden to prove prior crimes by a preponderance of the evidence and defined that standard.

### a. Sexual Assault of Jennifer M.

In accordance with the parties' stipulation, the February 1994 sworn testimony of Jennifer M. was read to the jury. Jennifer testified that, on October 22, 1993, a man she later identified as Erskine waved her over while she was waiting for the bus and invited her into his home for a beer. While in the home, Jennifer observed Erskine snort methamphetamine; she did as well. Erskine then choked her to the point of passing out and defecating herself. When she came to, Erskine told her to remove her clothes, tied her hands behind her back with a yellow rope, placed duct tape over her mouth, cleaned her off, and shaved her genitals. He then threatened her with a shotgun and forced her to engage in repeated oral copulation and vaginal penetration using both his penis and a vibrator. After the assault, Erskine gave Jennifer clothes to wear and cooked her a steak, and then drove her to a meeting with a classmate at the

Hyatt Regency Hotel.  She waited five days before calling the police.

The detective who interviewed Jennifer M. testified that she was "emotionally extremely shaken" and appeared to have been injured, noting hemorrhage in both eyes and bruising. Erskine was arrested returning to his apartment later that day. Police seized a shotgun and ammunition from the apartment, along with yellow rope, duct tape, narcotics, and other items consistent with Jennifer's description of the assault.  A search of Erskine's car, a blue Volvo, yielded black electrical tape, a roll of adhesive tape, and more yellow rope.

### b.  Renee Baker Homicide

Robin Smith was a patrol officer for the Palm Beach Police Department on June 23, 1989, when she responded to a pedestrian who spotted a body — later identified that of Renee Baker — lying on the ground atop an oyster bed on the intercoastal waterway.  Officer Smith observed a "neat" pile of clothing with a purse and a necklace placed on top near the body, which was naked.  There were drag marks leading from an area of bushes through the sand to the location of the body. A cigarette butt was found approximately nine feet from the clothing.

Baker's autopsy revealed signs of asphyxia, manual strangulation, and snapped ligaments in the back of the neck consistent with hyperflexion.  Tissue analysis suggested that the manual injuries to the neck occurred at least an hour before death and would have required significant force.  The cause of death was determined to be drowning, with blunt neck trauma as a contributory cause of death.  The pathologist explained that

either Baker was repeatedly assaulted culminating in being held underwater; or she was left injured at the scene to drown face down in the tidal current. DNA analysis conducted in 2000 of epithelial cells from the cigarette butt and sperm cells from an oral swab of Baker were found to match Erskine.

### 2. Analysis

Erskine argues as he did below that the evidence did not satisfy the criteria for admissibility under either section 1101 or section 1108 and, moreover, should have been excluded under section 352 as more prejudicial than probative. Erskine further argues that the evidence was cumulative and unnecessary, as evidenced by the prosecutor's closing arguments referring to uncontested or inarguable evidence of guilt. Finally, he argues the error here violated his right to due process and therefore cannot be regarded as harmless.

"Evidence Code section 1101, subdivision (a) sets forth the ' "strongly entrenched" ' rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion." (*People v. Jackson* (2016) 1 Cal.5th 269, 299 (*Jackson*).) "At the same time, 'other crimes' evidence is admissible under Evidence Code section 1101, subdivision (b) 'when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes.' " (*Id.* at p. 300.) "In this inquiry, the degree of similarity of criminal acts is often a key factor, and 'there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: "The least degree of similarity . . . is required in order to prove intent . . . ." By

contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is required to prove identity.' " (*Ibid.*)

Section 1108 "carves out an exception to section 1101." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823 (*Daveggio and Michaud*).) Section 1108, subdivision (a) provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (See *People v. Story* (2009) 45 Cal.4th 1282, 1294 ["section 1108 applies . . . when the prosecution accuses the defendant of first degree felony murder with rape (or another crime specified in section 1108, subdivision (d)(1))."].) Section 352 articulates the general rule that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See *Daveggio and Michaud*, at p. 823.) "It follows that if evidence satisfies the requirements of section 1108, including that it is not inadmissible under section 352, then the admission of that evidence does not violate section 1101." (*Ibid.*) The trial court's ruling admitting evidence under these provisions is reviewed for an abuse of discretion. (*Id.* at p. 824; see also *id.* at p. 827 [admission of prior crimes evidence pursuant to § 1108 does not violate due process].)

In this case, Erskine was accused of a sexual offense; under section 1108, evidence of the other two crimes was

therefore not inadmissible under section 1101 to show Erskine's propensity to commit the sexual offenses upon which the murder charge and the special circumstance allegations were based, so long as the evidence was not inadmissible under section 352. It is not necessary to assess the trial court's separate finding that common characteristics between the charged acts and the prior incidents were probative as to identity, deliberation or premeditation, and intent to commit the charged crimes and therefore also admissible under section 1101, subdivision (b). (See *People v. Merriman* (2014) 60 Cal.4th 1, 40 (*Merriman*).)

As to admissibility under section 352, evidence of past sexual offenses proffered under section 1108 requires the court to "undertake[] a careful and specialized inquiry to determine whether the danger of undue prejudice from the propensity evidence substantially outweighs its probative value." (*Merriman*, *supra*, 60 Cal.4th at p. 41.) Among the factors to consider are the " 'nature, relevance, and possible remoteness [of the evidence], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses.' " (*Ibid.*, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 917; see *People v. Ewoldt* (1994) 7 Cal.4th 380, 404–407 [conducting similar analysis under § 1101, subd. (b)].)

Erskine argues that this evidence was not relevant to any contested issue before the jury in light of the uncontested biological evidence establishing that Erskine killed Jonathan and Charles. But it is the prosecutor's burden to establish every element of the crime, regardless of whether the defendant offers a defense or not (see, e.g., *People v. Roldan* (2005) 35 Cal.4th 646, 705–706; *People v. Catlin* (2001) 26 Cal.4th 81, 146), and it would not have been unlikely, in 2003, for one or more jurors to be leery of convicting for capital crimes based principally on the scientific DNA evidence in this case. Here, the other-crimes evidence helped fill in the picture, especially considering the common characteristics between the incidents, including evidence of strangulation and oral copulation, the presence of cigarette butts and neatly stacked clothing near Baker's body, and the use of ropes and tape to restrain Jennifer M. The case for admission was especially strong with respect to the assault of Jennifer M., for which Erskine had been convicted. (See *Daveggio & Michaud, supra,* 4 Cal.5th at p. 825 ["the fact that defendants had been convicted [of similar crimes] weighed heavily in favor of admission"].) Moreover, we agree with the trial court that although the prior incidents involved "egregious conduct," the charged crimes "involve[d] far more inflammatory conduct." Accordingly, we conclude the trial court did not abuse its discretion by admitting this evidence.

## III.  PENALTY PHASE ISSUES

### A. Alleged *Witt* Error

Erskine contends that the trial court violated his right to an impartial penalty phase jury under the federal and state Constitutions by erroneously excusing Prospective Juror

No. 154 for cause because of her views on the death penalty. (See *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).) "A prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 (*Cunningham*), quoting *Witt*, at p. 424.)

### 1. Background

On her juror questionnaire, Prospective Juror No. 154 stated that she is "not in favor of the death penalty in general" but is "fair and honest about following the judges [*sic*] direction." She added, "I believe the [United States] should outlaw the death penalty as I do not believe 'an eye for an eye,' " while life imprisonment without the possibility of parole "is the appropriate direction of punishment society should take." When asked for what kinds of crimes, if any, she believed the death penalty should be imposed, she answered "none"; she stated that the death penalty is imposed "too often," explaining, "I do not believe it should be done." She answered that life without the possibility of parole is a worse punishment than death, explaining that "taking away a persons [*sic*] freedom" is "sufficient[] punish[ment]" and that "[i]t is, I feel, important in some cases to do this without possibility of them ever being returned to society — But <u>not</u> to take their life." She answered "yes" to whether her opposition was so strong that it would substantially affect her ability to impose the death penalty regardless of the facts and "yes" to whether she had any moral, religious, or philosophical opposition to the death penalty so

strong that it would substantially affect her ability to impose the death penalty regardless of the facts.  She explained, "I am not positive that I will not feel responsible should the decision be the death penalty.  I would need to discuss further (<u>after</u> the case) w[ith] my Rabbi."  She stated she did not know whether she could be open-minded about the penalty in this case explaining:  "I thought myself to be open minded however going through this questionnaire I'm not positive I can be a deciding vote in taking a person's life."  She concluded, "I feel as though I have maybe contradicted myself about my attitude against the death penalty and my ability to be open and nonjudgmental about deciding the case.  But it's kind of like my being highly pro-choice but I couldn't imagine having an abortion when I found I was pregnant.  Attitudes change upon circumstance and life experience.  I do feel I can follow the laws laid out by the judge."

During voir dire, Prospective Juror No. 154 agreed that she was open to returning a death verdict if she "was convinced that that was the appropriate sentence in accordance with the laws of the state of California" and that she could follow the laws that the judge would provide, but added, "I don't know how I would feel should the case be that this gentleman was, you know, sentenced to death.  I'm not positive that I could handle that afterwards."  In response to questions from the prosecutor, she clarified that her moral, religious, or philosophical opposition to the death penalty would affect how she "would feel personally after" the verdict, but that it would not substantially affect how she would judge or view this case.  But she confirmed her response on the questionnaire that she felt so strongly against the death penalty that it would substantially affect her

ability to vote for the death penalty no matter what evidence was presented, although she said this response reflected "the emotional state, in consideration, that I was in at that time . . . having not considered it in the past." She also confirmed she still felt "I'm not positive I can be a deciding vote in taking a person's life," as stated on her questionnaire.

The prosecutor challenged Prospective Juror No. 154 for cause. The trial court offered a tentative view based on its "observations and reading the questionnaire" that the juror was not death qualified. The prosecutor argued that her questionnaire as well as her responses on voir dire indicated that "her feelings on the death penalty would substantially affect her ability to return a death verdict." The prosecutor explained, "The fact that she wants to intellectualize that she would realistically consider both penalties is not the standard. The standard is, would her opposition to the death penalty substantially affect her decisionmaking process? She has repeatedly said, yes, it would. Let's take this juror at her word."

The trial court found that Prospective Juror No. 154 was not qualified to be a juror, citing her questionnaire responses "that she feels so strongly against the death penalty that it would substantially affect her ability to vote for the death penalty, no matter what evidence was presented." The trial court added, "As a matter of fact, this was one of my ones that I had checked off after reading the questionnaires. So I believe that she is unable to vote for death."

### 2. Analysis

As an initial matter, we agree with Erskine that the prosecutor was not correct in stating that "[t]he standard is,

would her opposition to the death penalty substantially affect her decision-making process?" A juror is permitted to consider the aggravating and mitigating evidence in light of his or her own views regarding punishment; the appropriate question for the court is whether the juror's views would " ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath." (*Cunningham*, *supra*, 25 Cal.4th at p. 975, quoting *Witt*, *supra*, 469 U.S. at p. 424.)

"The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment" "does not require that a juror's bias be proved with 'unmistakable clarity.' " (*Witt*, *supra*, 469 U.S. at p. 424.) Many prospective jurors have never been called upon to publicly articulate their views regarding the death penalty, and Prospective Juror No. 154 acknowledged that whether she could vote for the death penalty in a criminal trial was not a question she had considered in the past. In this case, we find apt the high court's observation that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." (*Id.* at pp. 424–425.) Even when the record contains equivocal or ambiguous responses, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Id.* at p. 425–426; see *People v. Lynch* (2010) 50 Cal.4th 693, 733 [trial court's assessment of

juror's state of mind in the event of conflicting or equivocal responses is binding on appeal].)

Here, the trial court was attentive to Prospective Juror No. 154's questionnaire responses, and the inconsistencies in those responses were not resolved through voir dire, despite efforts by defense counsel and the prosecutor. For example, the juror stated on voir dire that she was open to imposing the death penalty if appropriate under the law as provided by the court. But she also confirmed her questionnaire answer that she was "not positive [she] can be a deciding vote in taking a person's life." The trial court, based on its "observations and reading the questionnaire," was left with the definite impression that Prospective Juror No. 154 was "unable to vote for death." Although it was not necessary for the court to find the juror "unable" to vote for death in order to satisfy the *Witt* inquiry, such a finding is nevertheless a sufficient basis to excuse the juror for cause. We have no basis for second-guessing the trial court's conclusion in the face of Prospective Juror No. 154's equivocal answers.

## B. Constitutionality of Penalty Phase Retrial Following a Hung Jury

Erskine argues, as general matter, that penalty retrial following a hung jury violates his rights to a fair jury trial, reliable penalty determinations, freedom from cruel and unusual punishment, due process and equal protection, as guaranteed under the federal and state Constitutions. We have consistently rejected this claim. (See, e.g., *People v. Reed* (2018) 4 Cal.5th 989, 1016.) Erskine notes that the first set of jurors deliberated for four days on the issue of penalty before declaring

they were hopelessly deadlocked, while the second jury required just three hours of deliberation to return a death verdict. But he does not explain how this affects our analysis or offer any other reason to revisit our precedent.

### C. Empirical Evidence Regarding Application of the Death Penalty and Alternative Remedies

#### 1. Background

Erskine moved before trial to declare the death penalty unconstitutional in practice, citing to several social science studies purporting to show that capital jurors in various states do not follow the constitutional guidelines established in *Furman v. Georgia* (1972) 408 U.S. 238 and its progeny. In response to the prosecution's opposition to the motion, Erskine proposed two alternative remedies if his motion were denied: (1) sequestered voir dire per *Hovey v. Superior Court* (1980) 28 Cal.3d 1; or (2) asking prospective jurors whether they believed death to be the only appropriate punishment for certain crimes. The trial court denied the request for sequestered voir dire, denied the specific written questions, and deferred ruling on the motion itself until after the jury reached a verdict.

After the penalty phase retrial and verdict, the trial court held a multiday hearing regarding the motion, including three days of testimony from Dr. William Bowers of the Capital Jury Project. Following the hearing and argument, the trial court denied Erskine's motion to declare the death penalty unconstitutional in general or as applied in his case. The trial court explained: "A lot of the study doesn't consider, if a juror has feelings or thoughts on a subject, whether those thoughts or feelings may be set aside and whether a juror may be able to

follow jury instructions. [¶] Throughout our courts — both the U.S. Supreme Court and the California Supreme Court, the Ninth Circuit — there always is the crucial assumption underlying our system that jurors understand and faithfully follow court instructions. [¶] I don't believe the evidence that was produced in support of defendant's motion rebuts that presumption in this case. [¶] There was a time lag from the time decisions were made by the jurors and the time they were interviewed. . . . The questioning of the Capital Jury Project, of course, doesn't . . . allow the jurors to refer to . . . [their] instructions, [which were there] in the jury room with them to refer to during their deliberations. . . . [I]t seems to me that, in many of these cases, before we can come to broad, sweeping conclusions, I think we've got to go back and look at fact-specific cases and fact-specific jurisdictions. And I think there is some difficulty in lumping in the practices and procedures [in different states] and different wording of statutes in coming to broad, sweeping conclusions. . . . And for those reasons, including the fact that I think the court is bound by precedent, the defendant's motion is denied."

### 2. Analysis

This court has rejected similar empirical evidence, albeit in cases where the evidence was not placed in the trial record or subject to cross-examination. (See, e.g., *People v. Ervine* (2009) 47 Cal.4th 745, 798 [pattern instruction regarding life without the possibility of parole], citing *People v. Lindberg* (2008) 45 Cal.4th 1, 53; *People v. Abilez* (2007) 41 Cal.4th 472, 527–528; *People v. Boyer* (2006) 38 Cal.4th 412, 487.) For many of the reasons cited by the trial court, Erskine's evidence does not

rebut the presumption that jurors are presumed to understand and accept the court's instructions. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn.17.) And, with the exceptions discussed below, Erskine does not challenge the sufficiency of the instructions in this case. Nor does Erskine offer any evidence that jurors in this instance failed to follow the law as set forth in the court's instructions.

In the alternative, Erskine argues the trial court erred by denying two proposed remedies: (1) individual, sequestered voir dire; or (2) questioning prospective jurors about whether they believed that death was the only appropriate punishment for specific types of crimes. The first argument has been rejected by this court. (See *People v. Lewis* (2008) 43 Cal.4th 415, 493–494, disapproved on another ground in *People v. Blac*k (2014) 58 Cal.4th 912, 919.) As to the second, the questionnaire in this case elicited similar information (for example, asking jurors, "For what kinds of crimes, if any, do you believe the death penalty should be imposed?" and "Do you feel so strongly in favor of the death penalty that it would substantially affect your ability to vote for life imprisonment without possibility of parole, no matter what evidence was present?"). Erskine does not point to any instances in which the court precluded him from asking such a question directly on voir dire. We therefore reject this claim.

## D. Error To Instruct Jury To Reach a Penalty Verdict "Regardless of the Consequences"

The trial court's preliminary instructions to the jury at the second penalty phase trial included CALJIC No. 1.00, which instructs the jurors on the respective roles of the judge and jury

and concludes with the following admonition, to which Erskine objects: "Both the People and a defendant have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach a just verdict *regardless of the consequences*." (Italics added.) We have repeatedly explained that this instruction should not be given at the penalty phase because the " 'consequences' " at the penalty phase — the choice between death and life imprisonment without the possibility of parole — "are precisely the issue that the jury must decide." (*People v. Brown* (1985) 40 Cal.3d 512, 537, fn. 7, revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538; see also *People v. Kipp* (1998) 18 Cal.4th 349, 379 (*Kipp*) [same].) The Attorney General concedes the instruction was given in error and that the issue is cognizable on appeal even though Erskine did not object at the time, but argues the error was harmless as the instructions as a whole adequately conveyed the appropriate scope of the jurors' duties.

"[W]e have generally declined to find prejudice when the instruction is viewed as part of the entire charge, reasoning that the jury is almost certain to understand 'that it was entitled to disregard only those "consequences" not constitutionally relevant to its sentencing decision, and that it bore the ultimate responsibility for choosing between death and life imprisonment without parole based on the particular circumstances of the case.' " (*Kipp, supra,* 18 Cal.4th at pp. 379–380.) Erskine argues the error was not harmless in this instance because the prosecutor "indoctrinated" the jurors repeatedly from voir dire through closing argument "with the incorrect notion that they were required by law to impose the death penalty if they found that aggravating factors outweighed

mitigating factors." But the jurors were correctly instructed as to the proper weighing of aggravating and mitigating factors and that "[i]f anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." Erskine does not independently argue that the prosecutor's comments rose to the level of misconduct; in any event, "[W]e presume the jury understood and followed the court's instructions." (*Jackson*, *supra*, 1 Cal.5th at p. 352.)

### E. Miscellaneous Challenges to the Death Penalty

Erskine raises a number of challenges to the constitutionality of California's death penalty statute that we have consistently rejected. Erskine provides no persuasive reason to revisit the following precedent:

We have previously held that Penal Code section 190.2 " ' "adequately narrows the class of murderers subject to the death penalty" ' " and thus does not violate the Eighth Amendment to the federal Constitution. (*People v. Masters* (2016) 62 Cal.4th 1019, 1077 (*Masters*); see also *People v. Cunningham* (2015) 61 Cal.4th 609, 671; *People v. Ramos* (2004) 34 Cal.4th 494, 532–533.)

We have held that neither the Eighth Amendment nor the due process or equal protection guarantee of the federal or state Constitution precludes imposition of a death sentence against an individual with intellectual impairments short of intellectual disability or insanity. (*People v. Boyce* (2014) 59 Cal.4th 672, 721–723.)

" 'The alleged inconsistency between regular imposition of the death penalty and international norms of human decency does not render that penalty cruel and unusual punishment under the Eighth Amendment [citation]; nor does "regular" imposition of the death penalty violate the Eighth Amendment on the ground that " '[i]nternational law is a part of our law.' " (*Masters, supra,* 62 Cal.4th at pp. 1077–1078, quoting *People v. Lee* (2011) 51 Cal.4th 620, 654.)

Both this court and the high court have held that the current application of Penal Code section 190.3, factor (a), is constitutional. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976; *People v. Johnson* (2016) 62 Cal.4th 600, 655; *People v. Rountree* (2013) 56 Cal.4th 823, 860.)

" 'Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation [or to] agree unanimously that a particular aggravating circumstance exists.' " (*People v. Williams* (2013) 58 Cal.4th 197, 295.) Nor is the death penalty statute unconstitutional for not requiring "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.)

"Neither intercase proportionality nor disparate sentence review is constitutionally compelled." (*Jackson, supra,* 1 Cal.5th at p. 373, citing *People v. Banks* (2014) 59 Cal.4th 1113, 1207; *People v. Eubanks* (2011) 53 Cal.4th 110, 154.) " 'Moreover, "capital and noncapital defendants are not similarly situated

and therefore may be treated differently without violating" a defendant's right to equal protection of the laws, due process of law, or freedom from cruel and unusual punishment.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 316 [240 Cal.Rptr.3d 315, 381].)

" 'The jury may properly consider evidence of unadjudicated criminal activity under [Penal Code] section 190.3, factor (b) (*People v. Whisenhunt* [(2008)] 44 Cal.4th [174,] 228), [and] jury unanimity regarding such conduct is not required [citation].' (*People v. Lee* (2011) 51 Cal.4th 620, 653)." (*People v. Powell* (2018) 6 Cal.5th 136, 193 (*Powell*).)

" ' "The use of the words ' "extreme" ' in [Penal Code] section 190.3, factors (d) and (g), and ' "substantial" ' in factor (g), does not act as a barrier to the consideration of mitigating evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments." [Citation.]' (*People v. Cage* (2015) 62 Cal.4th 256, 296 . . . .)" (*Powell*, *supra*, 6 Cal.5th at p. 194.)

" ' " ' " '[T]he statutory instruction to the jury to consider "whether or not" certain mitigating factors were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors.' " ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 766; accord, *People v. Linton* [2013] 56 Cal.4th [1146,] 1216.) "There is no constitutional requirement that the jury be instructed regarding which of the statutory factors in [Penal Code] section 190.3 are aggravating, which are mitigating, and which could be either aggravating or mitigating." (*People v. Merriman*[, *supra*,] 60 Cal.4th [at pp.] 106–107.)' " (*Powell*, *supra*, 6 Cal.5th at p. 194.) Nor was the trial court required to delete inapplicable factors

from CALJIC No. 8.85.  (*People v. Watson* (2008) 43 Cal.4th 652, 701.)

## IV.  CONCLUSION

We affirm the judgment in its entirety.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Erskine

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S127621
**Date Filed:** May 23, 2019

_____

**Court:** Superior
**County:** San Diego
**Judge:** Kenneth K. So

_____

**Counsel:**

Kimberly J. Grove, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Robin Urbanksi, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kimberly J. Grove
P.O. Box 425
Ligonier, PA  15658
(724) 238-3497

Robin Urbanksi
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9115