Filed 2/4/21  P. v. Foster CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B302307 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA476824) |
| v. | |
| REGINALD FOSTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie A. Swain, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez, Michael Keller and Paul S. Thies, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Reginald Foster appeals from his conviction for raping and injuring his girlfriend.  He contends the trial court prejudicially erred in admitting evidence of a prior uncharged sexual offense against a former girlfriend under Evidence Code section 1108.[1]  We conclude there was no error.  We therefore affirm the judgment.

## PROCEDURAL HISTORY

The Los Angeles County District Attorney charged appellant by information on May 15, 2019 with one count of injuring a girlfriend (Pen. Code, § 273.5, subd. (a); count one) and one count of forcible rape (Pen. Code, § 261, subd. (a)(2); count two).  The information further alleged on count one that appellant personally inflicted great bodily injury under circumstances involving domestic violence (Pen. Code, § 12022.7, subd. (e)).

The jury found appellant guilty on both counts, but found the great bodily injury allegation not true.  The court sentenced appellant to a total of seven years in state prison, comprised of the mid-term of six years on count two, plus a consecutive term of one year on count one.  Appellant timely appealed.

## FACTUAL BACKGROUND

### I.   The 2019 incident against Diana

The victim, Diana, testified that she and appellant dated "off and on" for almost two years, starting in May 2017.  He is about 22 years younger than she is, and when she mentioned the age difference, he said he liked "older women."

---

[1]All further statutory references are to the Evidence Code unless otherwise indicated.

2

On Friday, March 8, 2019, appellant picked up Diana to spend the weekend together. He drove them to his apartment. They both showered, ate dinner, and watched television. Diana had taken pain medication earlier in the day because of a pinched nerve and she started feel drowsy. Diana explained that it was getting late and she wanted to lie down, but appellant said no. He wanted to keep talking and demanded her full attention. Diana said "just take me out" about three times, meaning to just let her leave. She testified that at times appellant would "talk on, and on" and "demands you to sit and give him your undivided attention," so she said that to "get him to stop. I didn't want to hear what he had to say." According to Diana, appellant responded by hitting her with his fist on the side of her face. She did not know if he hit her more than once because she lost consciousness. When she came to, she touched her face and noticed blood on her hand. She could feel her face starting to swell. She asked appellant, "What did you do to me?" Appellant told her that he spared her life because he heard her crying.

Diana looked in the mirror and said it looked like "somebody beat me up," with a swollen face and a gash near her left temple. They went to the bathroom and appellant got a towel and some medicated patches for her face. Diana testified that when he tried to help her, "I was clenching and stuff because I didn't want him nowhere near me because I was thinking he might hit me again." She had to change the dressing frequently because she had sustained an "open wound" that continued to bleed. Appellant got some ice for his knuckles and Diana sat on the bed. She could not see out of her eye. She asked if she could lie down and appellant said she could. She testified that she did not call the police because she was afraid to do so.

After she lay down, appellant lay on the bed as well, and told her to "[c]ome lay next to daddy." When she said she did not want to, appellant responded, "Yes, you do. Come lay down." Diana stated that appellant tried to apologize, then said, "Let's make love." She did not want to "after somebody hit you, and you just can't see out of your eye and you [*sic*] still bleeding." Appellant straddled her and tried to pull her pants down, but she crossed her legs to stop him. After a while, she "just gave up," and appellant pulled off her pants. Diana testified that the entire time she continued to tell him "no," and cried. Her face also continued to bleed. Appellant forced her legs apart and penetrated her vagina with his penis. She did not recall how long the penetration lasted. Afterward, appellant got up and went to the bathroom. Diana testified that she did not try to call the police at that point because her phone was charging somewhere else in the apartment, and if she got up to get it, appellant would have noticed.

Diana then cleaned herself up, dressed, and laid back down to "try to rest." Both she and appellant slept a little bit. After waking up Saturday morning, appellant asked her to do something and when she "didn't move fast enough" he asked her, "Do you want some more?" She said "no" and did what he told her to do. She had a doctor's appointment later that day and asked appellant, "How can I go looking like this?" He told her that if anyone asked what happened, "just tell them you walked into a wall."

Diana waited until appellant left to go to work around 6:00 p.m., then she called her daughter, C. She also texted her daughter a photo of her face. When C. came to pick her up, Diana took all of her belongings from the apartment. Appellant

4

had taken her set of keys to the apartment, so she left it unlocked and texted him to let him know. She also texted appellant that she was going to leave on a Greyhound bus in the morning, in order to make it harder for him to find her, because he had previously told her "how he handles situations and . . . no matter what if anything was to happen I will find you."

Diana did not go to the hospital that day, although her daughter asked if she wanted to go. She testified that she "just wanted to get away . . . just try to get a grasp of everything that actually went on." She told her daughter about the assault. She also testified that she tried to tell her daughter about the rape as they were leaving appellant's apartment, but C. was upset and said she did not "want to hear it." She did not call the police because appellant "told me so many other stories about things that he's capable of doing, so I would have been traumatized by that and it took me a moment to just think about it."

Diana went to the hospital a few days later, on Monday, March 11, 2019. She testified that she did not report the assault or rape at that time because she was "still traumatized." She returned to the hospital a month later because she was continuing to suffer from headaches and issues with her vision. At trial, she showed the jury her scar from the wound on her left temple.

Diana also testified that she had been wanting to end the relationship for about six months before the incident. She stated that appellant liked to control her behavior. When she tried to end things, appellant stated that if she wanted out of the relationship "then you need to find another woman to replace you to be with me." He also threatened her and told her she could not leave the relationship. Sometimes, Diana would make excuses to

avoid seeing appellant; other times, she would try to give the relationship a chance. When she pushed back against appellant's demands, he would tell her that she needed to "humble" herself and to "give him respect in his house."

Diana continued to exchange text messages with appellant for a few days after the incident, trying to end the relationship. Appellant told her they were no longer "a harmonious couple," but "we're not done yet." The texts also discussed the incident, including that Diana said "take me out," that appellant spared her life, and that he helped her treat her wounds. Appellant also asked Diana to forgive him and promised that he would "never do such an act ever again." Diana cut off contact with appellant on March 12, 2019.

Diana's daughter C. testified that she picked her mother up on March 9, 2019 after her mother texted her that it was an emergency. Her mother also sent a picture of her face and C. could see that Diana's eye was swollen and it looked like she was bleeding from a wound above her eye. Diana was very upset, but she did not want to go to the hospital or contact the police, she stated that she just wanted to "hurry up and leave" appellant's apartment complex. Initially, Diana just told C. that appellant hit her. After a few days, she started telling C. more details about the incident, including that appellant had raped her.

Diana went to the police station to report the incident on March 16, 2019. She met with Los Angeles Police Department (LAPD) officer Paul Navarro. Navarro testified that in her initial report, Diana stated that her boyfriend struck her five to 10 times, causing her to lose consciousness. She did not disclose any

6

sexual crimes.[2]  Navarro took photographs of Diana's injuries and the text messages between her and appellant.

LAPD detective Deandre James interviewed Diana again on March 25, 2019.  Diana told him about the sexual assault. She also told him about two prior unreported incidents of domestic violence.  LAPD officers arrested appellant on April 17, 2019.

## II.    The uncharged 2006 incident against Jeanelle

During the investigation into the 2019 incident, Diana mentioned appellant's former girlfriend, Jeanelle. Detective James contacted Jeanelle, who confirmed she had previously been in a dating relationship with appellant.  She also confirmed to James that there was an incident with appellant in 2006, but said she could not remember exactly what happened because it was so long ago.  She told James that she did not remember reporting a sexual assault involving appellant.

Jeanelle testified that she dated appellant in 2006.  At the time, she was 53 and appellant was in his 20's.  The prosecutor showed her the police report she filed in 2006 reporting that appellant had raped her.  Jeanelle claimed she did not remember filing any such report.  After reviewing the report, she testified that it "said what happened and I don't remember saying any of that."  Jeanelle also denied that appellant raped her. Additionally, she stated she could not recall being interviewed recently by detective James.  She also said that she did not have any positive feelings toward appellant because of "what you're talking," but refused to provide any details, stating, "Time passed, just let it go, that's it."  When asked about the details of

---

[2]Diana testified that she reported both the physical and the sexual assault during her initial meeting with officer Navarro.

7

the report, she continued to state that she did not remember.

LAPD officer Sybil Licea testified that she met with Jeanelle on October 26, 2006. At that time, Jeanelle reported that appellant raped her. Jeanelle told officer Licea that she and appellant were dating. At the time of the incident, appellant said he wanted to make love to Jeanelle, but she said "no." Appellant threatened that he would "break your left arm if you don't stop moving." Appellant forced her legs open and put his mouth on her vagina for about 30 minutes. He then penetrated her vagina with his penis, which caused her pain. During the penetration, he held her down and pinned her arms above her head. Jeanelle told officer Licea that the encounter lasted about two hours.

After the assault, Jeanelle told officer Licea that she and appellant fell asleep. When they woke up the next morning, Jeanelle stated that "there was a domestic incident" during which she grabbed a fan to defend herself and appellant slammed her head into a wall at least three times. Jeanelle went to the police station to file the report the same day and LAPD arrested appellant shortly thereafter. Licea reported that Jeanelle had no visible injuries. Licea did not know if the case was ever filed.

Appellant did not testify or call any witnesses.

## DISCUSSION

Appellant contends the trial court erred in admitting evidence of the uncharged 2006 assault of Jeanelle. He argues that this evidence was substantially more prejudicial than probative, and therefore inadmissible under section 352. We find no abuse of discretion.

### I.    Relevant Background

Prior to trial, the prosecution filed a motion to introduce evidence of the 2006 incident pursuant to section 1108. At the

8

hearing on the motion, defense counsel objected, arguing that the evidence was highly prejudicial and minimally probative, particularly given that the incident occurred 13 years prior to the charged incident. Defense counsel also stated that she believed Jeanelle recently claimed "she couldn't remember reporting a sexual assault," that there was never a case filed, and that "we don't have any of the old evidence preserved." She further argued that it would be confusing to the jury.

The prosecutor responded that Jeanelle had recently confirmed her recollection in reporting the assault, and that "I strongly believe that Miss Jeanelle . . . will be able to recall the facts in this case." He also told the court that the officer who wrote the police report would be ready to testify if Jeanelle could not recall the incident.

The court found that the "potential prejudice from the confusion of the jury and the consumption of time is outweighed by its probative value," and therefore granted the prosecution's motion to allow Jeanelle to testify.

At trial, officer Licea testified without objection to the report she took from Jeanelle in 2006. She recalled Jeanelle's report that appellant raped her, but referred to her report to refresh her recollection throughout her testimony as to the details of the incident.

## II.    Legal Framework

Section 1108 "is an exception to the general prohibition against admitting character evidence to prove criminal disposition or propensity." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 352-353 (*Jandres*); see also § 1101, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) "In a sexual offense prosecution, the statute permits the admission of

9

evidence that the defendant 'committed other sexual offenses to prove his propensity to commit the charged sexual offense[ ],' so long as the evidence is admissible under section 352." (*Jandres*, *supra*, 226 Cal.App.4th at p. 353, quoting *People v. Cottone* (2013) 57 Cal.4th 269, 281 (*Cottone*); see also § 1108, subd. (a).)

"Section 352 articulates the general rule that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Erskine* (2019) 7 Cal.5th 279, 296 (*Erskine*).) "'By subjecting evidence of uncharged sexual misconduct to the weighing process of section 352, the Legislature has ensured that such evidence cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (§ 352.) This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.'" (*Falsetta, supra,* 21 Cal.4th at pp. 917-918.) The trial court's admission of evidence under these provisions is reviewed for an abuse of discretion. (See *Erskine, supra*, 7 Cal.5th at p. 296; *People v. Kipp* (1998) 18 Cal.4th 349, 369-371.) We do not disturb that ruling on appeal absent a showing that the court exercised its discretion in an "arbitrary, capricious, or patently absurd manner" that resulted in a "manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Under section 352, "evidence of past sexual offenses proffered under section 1108 requires the court to 'undertake[ ] a

careful and specialized inquiry to determine whether the danger of undue prejudice from the propensity evidence substantially outweighs its probative value.'" (*Erskine, supra*, 7 Cal.5th at p. 296, quoting *People v. Merriman* (2014) 60 Cal.4th 1, 41 (*Merriman*).) Among the factors to consider are the "'nature, relevance, and possible remoteness [of the evidence], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses.'" (*Merriman, supra*, 60 Cal.4th at p. 41, quoting *Falsetta, supra*, 21 Cal.4th at p. 917.)

III.   **Analysis**

Appellant argues that the trial court abused its discretion in admitting the evidence of the 2006 incident because its probative value was substantially outweighed by the danger of undue prejudice from its admission. We disagree.

Evidence of a "'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.'" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282; see also *Falsetta, supra*, 21 Cal.4th at p. 920 ["evidence of a defendant's other sex offenses constitutes relevant circumstantial evidence that he committed the charged sex offenses"].) Moreover, the "probative value of 'other crimes' evidence is increased by the relative similarity between the charged and uncharged offenses." (*Falsetta, supra*, 21 Cal.4th at p. 917.) Here, the similarity between the offenses strengthens the probative value of uncharged offense. In both

11

instances, appellant was in a dating relationship with a significantly older victim. Both offenses occurred in appellant's home, and involved appellant raping the victim after she rejected his request to "make love." Further, both included physical violence against the victim, as well as threats of additional violence. As such, we find no abuse of discretion in the trial court's determination that the 2006 incident was highly probative, given its similarities to the charged incident.

In addition, the probative value of evidence of uncharged misconduct also is strengthened when "its source is independent of the evidence of the charged offense." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404; *Falsetta, supra*, 21 Cal.4th at p. 917.) Here, Jeanelle's report to the police was made in 2006, long before and entirely unrelated to the charged offense, thus bolstering the probative value of that evidence.

Appellant contends that the probative value of the offense was significantly lessened given that it occurred 13 years before, and that it was "questionable" whether it happened at all in light of Jeanelle's testimony denying the rape and claiming she could not remember anything else. Although the prior offense was somewhat remote, this factor is subject to counterbalancing considerations. "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible. . . . [¶] Remoteness of prior offenses relates to 'the question of predisposition to commit the charged sexual offenses.' [Citation.] In theory, a substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offenses. However, . . . significant similarities between the prior and the charged offenses may 'balance[ ] out the remoteness.' [Citation.]

12

Put differently, if the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*People v. Branch, supra*, 91 Cal.App.4th at pp. 284-285; see also *People v. Frazier* (2001) 89 Cal.App.4th 30, 41 [15–or 16–year gap]; *People v. Soto* (1998) 64 Cal.App.4th 966, 977, 991-992 [more than a 20–year gap].) Here the substantial similarity between the two acts sufficiently outweighed the remoteness of the uncharged offense.

We also reject appellant's argument that the evidence was inadmissible given Jeanelle's lack of recall at trial. The jury was free to disbelieve Jeanelle's testimony that she could not recall anything, including a recent interview with detective James. Regardless, the jury heard evidence through officer Licea of the details of the offense as Jeanelle reported it in 2006. These details were presented without objection by defense counsel; indeed, many of the details about the incident were elicited by defense counsel during her cross-examination of Licea. The fact that the details of the 2006 offense did not come directly from the victim does not automatically render them so tenuous as to be inadmissible, nor does appellant cite any authority suggesting otherwise. Any potential prejudice was lessened by the fact that both Jeanelle and officer Licea were subject to cross-examination at trial. Moreover, the jury was instructed by the court, and reminded by the prosecutor during closing argument, that evidence of the prior offense was not sufficient, alone, to convict appellant of the current offense.[3] As such, we find no abuse of

---

[3]We presume the jury understood and followed these instructions. (See *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17; *People v. Williams* (2000) 79 Cal.App.4th 1157, 1171.)

discretion in the trial court's weighing of these factors under section 1108.

Appellant also asserts that the evidence of the uncharged offense was highly prejudicial because it was inflammatory, and thus should have been excluded on that basis. "Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial. [Citations.] But Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]" (*People v. Quang Minh Tran* (2011) 51 Cal.4th 1040, 1047.) "In this context, the word 'prejudice' is used in the sense of "'an emotional bias'" or "'of prejudging a person or cause on the basis of extraneous factors.'"" (*People v. Huy Ngoc Nguyen* (2010) 184 Cal.App.4th 1096, 1115.)

We are not persuaded that the evidence of the 2006 offense against Jeanelle was stronger or more inflammatory than the evidence of the charged offense. Appellant points to the fact that Jeanelle claimed appellant slammed her head against the wall three times, while Diana testified that he punched her only once. However, Diana also testified that she did not know how many times she was punched, but the blow was hard enough to cause her to lose consciousness. It also caused facial wounds and swelling, leaving a scar that was still visible at trial. Further, after punching her, appellant proceeded to rape Diana, even though she was crying and bleeding, and he later threatened to hit her again. This evidence was further supported by the text messages between appellant and Diana. Thus, the evidence of

14

appellant's uncharged acts, "was no stronger and no more inflammatory than the testimony concerning the charged offenses. This circumstance decreased the potential for prejudice, because it was unlikely that the jury disbelieved [Diana's] testimony regarding the charged offenses but nevertheless convicted [appellant] on the strength of [the evidence] regarding the uncharged offenses, or that the jury's passions were inflamed by the evidence of [appellant's] uncharged offenses." (*People v. Ewoldt, supra*, 7 Cal.4th at p. 405; see also *People v. Branch, supra*, 91 Cal.App.4th at p. 283 [finding uncharged offenses were not more inflammatory than similar charged offenses].) As such, it was not an abuse of discretion for the trial court to conclude that the evidence of the 2006 offense was not stronger or more inflammatory than the evidence supporting the charged conduct.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


WILLHITE, ACTING P.J.


CURREY, J.