Filed 5/31/24  P. v. Ryan CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MASON THOMAS RYAN,<br><br>    Defendant and Appellant. | H050234<br>(Santa Clara County<br> Super. Ct. No. C2014596) |

## I.  INTRODUCTION

A jury convicted defendant Mason Thomas Ryan of two counts:  sexual penetration of P.D.[1] when she was intoxicated (Pen. Code, § 289, subd. (e); count 1), and assault of P.D. with intent to commit rape and sexual penetration (*id.*, §§ 220, subd. (a)(1), 261, subd. (a)(3), (4), 289, subds. (d) & (e); count 2).  The trial court sentenced defendant to prison for three years.

---

[1] We refer to the victim by the initials of the name used for her at trial to protect her privacy.  (Cal. Rules of Court, rule 8.90(b)(4).)  In addition, we use the initials of the names used at trial for the two witnesses who provided evidence under Evidence Code section 1108.  (Cal. Rules of Court, rule 8.90(b)(10).)  Further, we use the initials D.A. to refer to a friend of defendant who was referenced at trial, consistent with the trial court's ruling that this person's name not be used because he was a minor at the time of the actions in question.  Finally, we use only the first names of P.D.'s friends who testified for the prosecution to protect P.D.'s privacy.  (Cal. Rules of Court, rule 8.90(b)(11).)

Defendant's actions came to light as a result of a social media campaign to expose alleged wrongdoing at defendant's high school. After viewing social media posts regarding incidents similar to her experience, P.D. anonymously posted an allegation that defendant took advantage of her while she was not capable of consenting to sexual activity. Police were able to identify P.D. and interview her. The social media campaign prompted other young women to allege that defendant engaged or attempted to engage in nonconsensual sexual activity with them. The trial court permitted two young women to testify at trial pursuant to Evidence Code section 1108,[2] over defendant's objection. Defendant challenges the trial court's ruling, asserting that the evidence of his commission of prior uncharged sexual offenses was not relevant to the issue presented at trial and that this evidence should have been excluded under section 352. Defendant also asks this court to order correction of his abstract of judgment by removing the designation of his conviction on count 1 as a violent felony. We agree that correction of the abstract of judgment is necessary, and we conclude that the trial court did not abuse its discretion by admitting the section 1108 evidence. Accordingly, we will affirm the judgment.

## II. BACKGROUND

### A. *Section 1108 Motions and In Limine Ruling*

The complaint, the information, and the amended information filed in this matter each contained a notice pursuant to section 1108 that the prosecution intended to offer evidence of another sexual offense or offenses against defendant. Accordingly, the prosecution filed a pretrial motion to admit evidence of uncharged sexual offenses by defendant concerning three alleged victims: C.D., M.D., and B.D.

The prosecution's motion proffered that C.D. would testify as follows. In March or April 2017, defendant and C.D. went on a walk with friends, and once defendant and

_____

[2] All further statutory references are to the Evidence Code unless otherwise specified.

2

C.D. were alone in a secluded area, defendant and C.D. began kissing.  Defendant then began taking off his pants and asked C.D. to perform oral sex on him.  C.D. repeatedly said " 'no' " and " 'no Mason, I don't want to,' " but as she resisted defendant, he "grabbed her by her shoulder and upper arm tightly and forced her head down toward his penis."  C.D. was able to free herself from defendant, at which point defendant told C.D. she " 'wasn't worth anything or good enough for him.' "  While the prosecution's proffer did not contain information about any intoxicating substances C.D. used, C.D. later testified at trial that she and defendant smoked marijuana before defendant's actions.  However, C.D. did not testify that her marijuana use impaired her.

The prosecution's motion proffered that M.D. would testify as follows.  In January 2018, defendant and defendant's friend D.A. picked up M.D. and two of M.D.'s female friends in defendant's car and drove to an area known as the Viewpoint.  On the drive to the Viewpoint, M.D., her friends, and D.A. consumed vodka, which made M.D. feel " 'intoxicated' and 'dizzy.' "  At the Viewpoint, defendant and M.D. began kissing in the front seat after the others had left the car.  Defendant then unzipped his pants and asked M.D. to perform oral sex on him.  M.D. told defendant she did not want to, so defendant "put his hand on the back of her head and pushed it down to his exposed penis."  M.D. was afraid that if she did not perform oral sex, defendant would leave her stranded at the Viewpoint.  While M.D. was engaged in oral sex with defendant, the other people returned to the car and began taking photos and videos of M.D. and defendant as M.D. continued the oral copulation.  Later, defendant drove to a park where he and M.D. walked to the bathroom area and defendant bent M.D. over a bench and pulled down her pants and underwear.  M.D. was still feeling intoxicated and was "unable to physically resist [d]efendant."  M.D. told defendant she was experiencing her period, after which defendant "began trying to insert his penis into her anus" while M.D. "was crying and repeatedly told [d]efendant 'No.' "

3

The prosecution's motion also contained a proffer of testimony by B.D., who had known defendant since the eighth grade, regarding an incident of alleged sexual misconduct by defendant in late 2018 or early 2019. The prosecution's motion argued that the evidence from all three witnesses was admissible under section 1108 because it was relevant to demonstrate defendant's propensity to commit sexual offenses, and because under section 352, the probative value of the evidence of the uncharged sexual offenses was not substantially outweighed by the probability that its admission would necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. The defense moved to exclude any evidence of uncharged sexual offenses regarding defendant. The parties then presented oral argument on the matter, including an argument by the defense that a witness to the incident regarding M.D. would testify that M.D. appeared to act consensually on the night in question.

The trial court stated that it found the alleged uncharged sexual offenses were similar to the charged offenses and therefore "highly probative of [d]efendant's sexual misconduct." The trial court stated that the proffered evidence was similar to the charged offenses for the following reasons: it "show[s] that when left with a young female who is either intoxicated or on medication, the defendant acts differently"; "[t]he defendant is also alleged in these conducts to take advantage of these acquaintances whose ability to resist is fairly limited, based on the fact that they are either intoxicated, or heavily medicated in one instance"; "[t]he defendant initially engages in sexual contact with each of these acquaintances before an assault is alleged to have been committed"; and "the victims all report being in an isolated area either with the defendant and D.A., or in an area where there aren't others to observe." The trial court also stated that the proffered evidence was not remote in time and was admissible under the balancing test outlined in section 352. However, the trial court ruled that the prosecution could only call two of the three witnesses listed in the prosecution's motion, leaving it to the prosecution to decide

4

which two witnesses to call at trial. The trial court also ruled that the prosecution would not be "permitted through any of their witnesses to introduce character evidence of defendant's reputation for being promiscuous with other women." The prosecutor elected to call C.D. and M.D. at trial.

### B. *The Prosecution's Case-in-Chief*

P.D., the named victim in the charged offenses, attended the same high school as defendant during her freshman through junior years. By the time of the charged offenses, P.D. had transferred to a different high school, but she still occasionally socialized with students at defendant's high school. On February 21, 2020, P.D. attended a party at the home of another high school student. Defendant arrived at the party later in the evening with two of his friends.

P.D. testified that she consumed alcohol at the party and was "[t]ipsy, not drunk" during the party, meaning she was "[r]elaxed," "[v]ery friendly and outgoing," physically able to take care of herself, and not slurring her words. Two of P.D.'s friends testified that P.D. consumed alcohol at the party and appeared somewhat intoxicated, though their accounts as to her apparent level of intoxication at the party varied.

After defendant and his friends arrived, the party ran low on alcohol. P.D. and Lindsey, one of P.D.'s friends, volunteered to ride to the store with defendant driving. P.D. testified that during the ride to and from the store to where defendant purchased alcohol, she was feeling "tipsy still." P.D. testified that there was no flirting or touching between her and defendant on the ride to the store, while Lindsey testified that on the ride to the store, she felt like the "third wheel" because P.D. and defendant were getting "more touchy" and were "just flirtatious, laughing, and kind of hitting it off."

P.D. and Lindsey testified that when the three returned from the store, they remained in the parked car passing around the box of wine defendant purchased. P.D. testified that "I took maybe three or more large swigs of [the wine] at least," that "I was . . . trying to drink as much as I could at once," and that "it would be like I was

5

drinking it for ten seconds at once." Lindsey testified that P.D. drank "[p]robably five to ten times" from the wine box, and that she "was chugging quite a bit of it, and at some point it spilled all over her." As she consumed the wine, P.D. testified, she "went from tipsy to really drunk." She testified that at this point, "everything was pretty blurry, and I was feeling very warm. And I couldn't really think straight." P.D. testified that she thought she might vomit at that point and she felt like she was slurring her words.

P.D. testified that as she was "feeling very, very drunk" in the car, "before I could recall what happened, me and the defendant were making out. And I looked back and Lindsey was gone." She testified that she felt "neutral" about the kissing and that "I was so drunk I was trying to figure out what was going on, so I kind of just went along with it" and kissed defendant back. Lindsey testified that she went inside the house where the party was taking place, but she did not remember the circumstances that led her to leave the car. Lindsey testified that she believed defendant and P.D. would follow her "eventually" into the house.

P.D. testified that when she realized Lindsey was not in the car, she felt "disoriented and confused as to what was going on." She testified that her next memory was of being in the back of the car and noticing her top was off and her pants were pulled down, with defendant in the back of the car with her. P.D. testified that she did not remember telling defendant she did not want to move to the back seat, that "I knew I didn't want to go any further than kissing," and that she remembered thinking "if he wants to go further, I'm on my period and I have a tampon in." However, she testified that she did not remember telling defendant that she was experiencing her period. As she realized she was in the back seat with defendant, P.D. testified, she felt "kind of out of body a little bit," "in shock," "confused of what just happened," "drowsy," and "kind of in a fog, but I was understanding sort of what was going on."

Around this time, a group of people including Lindsey and P.D.'s best friend Niccola approached defendant's car after they realized defendant and P.D. were not at

6

the party. Niccola testified that when the group opened the front passenger seat of the car, she saw P.D., "grabbed her," and "carried her back to the house because she was, like, really drunk and couldn't walk." Niccola testified that P.D.'s top and bra were off, that P.D. did not have her underwear on, and that "[s]he was . . . crying and scared and said, like, she didn't want to do that," which Niccola understood to refer to sexual intercourse. Lindsey testified that she and Niccola helped P.D. put her top back on when P.D. exited the car, and that "I could tell [P.D.] was clearly intoxicated and she just did not have as much, like, mobility or function." Once P.D. returned to the party, Lindsey testified, P.D. was "crying, balling [*sic*] on the floor, and everyone else in the room was very high strung and stressed out." Lindsey also testified that back at the house, "I could tell [P.D.] was very intoxicated. People were having trouble getting her to stand up. She looked like a mess, was crying, and a little bit uncontrollable in that moment."

The next morning, P.D. realized that her tampon was still inside her. When she could not retrieve it, she went to a hospital to have it removed. P.D. did not tell hospital personnel that she had been sexually assaulted; however, within weeks of the February 21, 2020 party, she told Niccola, some other friends, her mother, and a school counselor that she had been sexually assaulted. In June 2020, P.D. was made aware of a social media campaign involving various allegations of wrongdoing at defendant's high school, including posts that P.D. testified involved allegations similar to what she experienced with defendant. Using an account that did not disclose her name, P.D. posted an allegation as part of this social media campaign that defendant sexually assaulted her. Based on information contained in this post, police were able to identify and interview P.D.

Consistent with the trial court's ruling concerning section 1108 evidence, the prosecution called two of the three witnesses it had identified—C.D. and M.D.—to testify about evidence of defendant's prior uncharged sexual offenses. Both generally testified consistently with the prosecution's proffer. C.D. testified that she accepted defendant's

7

offer to come to his house and smoke marijuana. C.D. testified that after they walked and smoked marijuana, defendant asked her to perform oral sex on him at least three times, that she said no at least three times, and that after she said no, defendant held her and pulled her head toward his penis. M.D. testified that after she drank "a few swigs" of vodka and was feeling the effects of the alcohol, defendant kissed her, which she was "fine" with. After that, defendant's friend D.A. and the two other females in the car left, at which point the following occurred: "[Defendant] pulled his penis out of his pants and told me to suck on it and I didn't want to, so I was like, no. And he told me it's okay, like, you're just gonna do it and I still didn't want to[,] but he just lightly padded my head down and I just did it." M.D. testified that she was afraid defendant and D.A. would get mad at the girls and would not give them a ride back. M.D. testified that while she was performing oral sex on defendant, "[t]here were a few times when I brought my head up and he would just bring it back down." M.D. testified that after a few minutes, the other people re-entered the car and M.D. stopped briefly before resuming oral copulation when defendant told her to keep going. M.D. testified that D.A. took photos of the oral copulation despite M.D.'s efforts to cover her face, and that she was "scared that that photo would get out, that other people would see that, that it could be used against me." M.D. testified that she traded seats with others in the car and moved to the back seat with defendant, at which point M.D. continued to perform oral sex upon defendant without trying to stop because she "just wanted it to be over" and "thought that if we could just make him finish then we would get to go home." M.D. also testified that defendant asked to have vaginal sex with her and she said no, stating that she was experiencing her period and was using a tampon. M.D. testified that defendant and D.A. "had me show them my tampon string because they thought I was just saying that as an excuse." After this, M.D. testified, defendant drove her and the others to a park, at which point he led her to a bathroom area. M.D. testified that defendant then pulled her pants down, pushed her onto her knees "not super hard," and "once again had me suck on his penis and he was taking

8

videos of it." M.D. testified that at that point, while she was still feeling the effects of the vodka, defendant asked her to engage in anal sex and she said no, at which point defendant "pulled me up" to a bench, "bent me over the bench," and "was rubbing his penis on my butt and then he started putting some pressure on my anus, but there was no penetration." Both C.D. and M.D. testified that they reported defendant's actions as a result of the same social media campaign that prompted P.D. to make her anonymous post.

In addition to P.D., Niccola, Lindsey, C.D., and M.D., the prosecution called the counselor at P.D.'s school to whom P.D. reported defendant's actions, the doctor who removed the tampon from P.D., and an expert in sexual assault trauma victim behavior.

### C. *The Defense's Case*

Defendant testified on his own behalf. Concerning P.D., defendant testified that P.D. was flirting with him and touching him in the car on the way to and from the store, and before leaving for the store, P.D. told defendant that she wanted to "hook up" with him. Defendant testified that at the party, P.D. did not seem as if she had been drinking any alcohol. Defendant testified that when he, P.D., and Lindsey returned from the store, the three people had three drinks each from the wine box and that P.D.'s drinks were not "crazy long or crazy short." Defendant testified that Lindsey then left the car and he started to leave as well but P.D. said she wanted to stay in the car with him. After that, defendant testified, he and P.D. talked, they kissed for about ten minutes, defendant asked P.D. if she wanted to have sex in the back of the car, and P.D. responded yes. Defendant testified that he and P.D. then got out of the car, that they both put the back seats down, that they took each other's clothes off, and that they then had vaginal intercourse until defendant heard a knock at the car window. At that point, defendant testified, one of his friends entered the car to signal that he was ready to go home, so defendant and P.D. ceased their sexual activity, got dressed, and said goodbye to each other. Defendant

9

testified that he did not perceive P.D. to be too intoxicated to consent to have sex while in the car, and that P.D. did not seem upset when they said goodbye to each other.

Defendant also testified concerning the accounts C.D. and M.D. provided. Concerning C.D., defendant testified that he asked C.D. to perform oral sex upon him, and when she said no, he asked her a second time in a "begging" way because he was embarrassed at being rejected and at the prospect of word spreading that he had been rejected. Defendant denied forcing C.D.'s head or body toward his penis, and he testified that after C.D. told him no a second time, he "stopped kind of completely kissing or pretty much any interaction at all." Concerning M.D., defendant testified that she verbally agreed to perform oral sex upon him, that M.D. continued to orally copulate him without objection while others were in the car engaged in their own sexual activity, and that M.D. "happily" moved to the back seat to continue the oral sex in the back of the car with another girl also taking part along with M.D. in orally copulating defendant. Defendant testified that he then drove the girls home without stopping at the park, that he did not threaten to leave M.D. or the other girls stranded without a ride, that he and D.A. did not ask M.D. to show them her tampon string, and that the actions that M.D. alleged occurred at the park did not take place.

Defendant's two friends who accompanied him to the party testified in the defense's case. Both generally testified that when they found defendant and P.D. in the car, P.D. did not seem upset or overly intoxicated. The defense called three experts. An expert in medicine, specifically the treatment of women for lodged tampons, generally testified that a man would not necessarily know that a woman had a tampon inserted while having vaginal intercourse with her. An expert in toxicology and alcohol use generally testified about the meaning of a "blackout," the different types of blackouts, the blood alcohol levels and conditions under which a blackout might occur, and signs of impairment and intoxication from alcohol consumption. An expert in forensic psychology, specifically the adolescent brain, generally testified about differences in

10

decision-making and evaluating risk and consequences between adolescent and adult brains, and the expert testified that adolescents are less likely to have experience in interpreting signs of intoxication and nonverbal cues during a sexual encounter. A police detective testified in the defense case concerning the steps he took to investigate this matter following the social media posts, and that when interviewing M.D., M.D. did not report all of the activity at the park that she later testified to. Finally, one of the three girls present during the actions concerning M.D. testified for the defense. This witness generally testified that all the sexual activity that occurred in the car appeared consensual and that defendant and M.D. did not leave the car when they stopped at the park. This witness testified that she was previously best friends with M.D. but that they no longer spoke because the witness did not want to "be friends with someone that makes up such sick lies." On cross-examination, the witness admitted that she earlier made certain statements to police that were more consistent with M.D.'s account, but she testified that she did so because she felt "threatened by" M.D. and "scared of her."

**D.** *The Prosecution's Rebuttal Case*

On rebuttal, the prosecution recalled its expert in sexual assault trauma victim behavior, who testified about misconceptions concerning post-assault conduct between a sexual assault victim and an assailant.

### III. DISCUSSION

**A.** *Admission of Evidence of Prior Uncharged Sexual Offenses*

Defendant contends that the trial court erred in admitting the evidence of his prior uncharged sexual offenses. As to the testimony from M.D., he essentially makes two arguments in asserting that the trial court erred. First, he argues that the acts testified to by M.D. were "not probative of the question whether [defendant] knew or reasonably should have known P.D.'s intoxicated state prevented her from giving legal consent," and "coupled with the substantial question whether the acts with M.D. occurred at all, evidence of the uncharged acts lacked probative value." (Italics omitted.) Related to his

11

argument regarding the evidence's lack of probative value, he contends that the uncharged acts M.D. testified to were not sufficiently similar to the charged offenses to be admissible. Second, he asserts that any probative value of the section 1108 evidence was substantially outweighed by its prejudicial effect. Under this argument, he makes three sub-points: (1) evidence of the acts against M.D. was more inflammatory than evidence of the charged offenses and therefore the jury was likely to punish defendant for this uncharged conduct; (2) much of M.D.'s testimony dealt with consensual acts, and the nature of these acts was such that the jury was likely to punish defendant for his conduct regarding M.D.; and (3) the propensity evidence regarding M.D. "carried a low degree of certainty the alleged acts occurred," while "testimony regarding the incident with M.D. consumed a substantial amount of trial time and placed a great burden upon [defendant] to disprove the allegations." (Underscoring omitted.) Defendant also argues that the trial court's error was not harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

Regarding C.D.'s testimony, defendant asserts that C.D.'s testimony was not relevant because the "nature and circumstances of [defendant's] alleged attempt to force C.D. into oral sex when he was 15 years old had no tendency in reason to show that [defendant] was predisposed to engage in conduct of the type charged or whether he reasonably should have known P.D. was unable to consent to a sexual act because of intoxication." (Italics omitted.) He also argues that the evidence regarding C.D. was inadmissible under section 352, arguing that evidence of defendant's acts regarding C.D. was "more inflammatory" than evidence concerning the charged offenses, and thus the jury "was likely to convict [defendant] and punish him for his uncharged, unpunished conduct." He also argues that the asserted error in admitting C.D.'s testimony was not harmless.

The Attorney General in response asserts that the trial court did not abuse its discretion in admitting evidence concerning defendant's prior uncharged sexual offenses

regarding both C.D. and M.D.  First, as to both witnesses, the Attorney General argues that the evidence was admissible under section 1108 because:  (1) it constituted evidence of prior sexual offenses; (2) the trial court was not required to determine whether the alleged prior acts actually occurred before allowing the testimony; and (3) similarity between the uncharged acts and the charged offenses is not required under section 1108.  Second, the Attorney General contends that the section 1108 evidence was admissible under section 352 "because it was relevant to show [defendant's] propensity to commit sexual assaults, sufficiently similar to and no more inflammatory than the charged crimes, not too remote, did not cause undue consumption of time, and did not confuse the issues or mislead the jury."  Finally, the Attorney General argues that any error in admitting the evidence was harmless under the *Watson* standard.

### 1. Legal Principles and Standard of Review

Section 1101, subdivision (a) states:  "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  "Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion.  [Citation.]" (*People v. Harris* (2013) 57 Cal.4th 804, 841.)  "The purpose of this rule is to avoid placing an accused in the position of defending against crimes for which he [or she] has not been charged and to avoid having a jury convict him [or her] on prejudicial character evidence alone.  [Citation.]"  (*Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 430.)

Section 1108 "carves out an exception to Evidence Code section 1101." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823 (*Daveggio and Michaud*).) In relevant part, section 1108 states:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual

13

offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a).)

By its terms, section 1108 sets out three conditions for admitting evidence under this provision. (See *People v. Merriman* (2014) 60 Cal.4th 1, 57–63 (*Merriman*).) First, the defendant must be "accused of a sexual offense." (§ 1108, subd. (a).) Section 1108, subdivision (d)(1) defines the term "sexual offense." In relevant part, section 1108, subdivision (d)(1)(A) lists several statutory offenses, the violation of which constitutes a "sexual offense"; section 1108, subdivision (d)(1)(B) states that any conduct proscribed by Penal Code section 220 except for assault with intent to commit mayhem constitutes a "sexual offense"; and section 1108, subdivision (d)(1)(F) states that an attempt or conspiracy to commit conduct described in subdivision (d)(1) constitutes a "sexual offense."

Second, "evidence of the defendant's commission of another sexual offense or offenses" must be offered. (§ 1108, subd. (a).) "[T]he admissibility of uncharged conduct pursuant to section 1108 turns on the existence of a preliminary fact—namely, that the uncharged conduct constitutes a statutorily enumerated 'sexual offense.' [Citation.] The trial court must make a preliminary determination of whether the proffered evidence is sufficient for the jury to find, by a preponderance of the evidence, that the defendant committed an enumerated offense. [Citations.] 'The court should exclude the proffered evidence only if the "showing of preliminary facts is too weak to support a favorable determination by the jury." ' [Citation.] 'The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion.' [Citation.] Accordingly, we review the trial court's determination of this preliminary fact under the abuse of discretion standard." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 353 (*Jandres*).) In reviewing the admissibility of evidence under section 1108, "[i]t is well settled . . . that the reliability of a witness's testimony is a matter for the jury to

14

decide and therefore concerns the weight of the evidence, and not its admissibility. [Citation.]" (*Merriman*, *supra*, 60 Cal.4th at p. 57.)

Third and finally, the evidence must be "not inadmissible pursuant to Section 352." (§ 1108, subd. (a).) Section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "To determine whether section 1108 evidence is admissible, trial courts must engage in a 'careful weighing process' under section 352. [Citation.] 'Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]' [Citation.]" (*Daveggio and Michaud*, *supra*, 4 Cal.5th at pp. 823–824.) " ' " ' "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . ." ' " ' " ' ' " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative

15

evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " ' " ' [Citation.]" (*Id.* at p. 824.)

In considering whether proffered section 1108 evidence is inadmissible pursuant to section 352, "[t]he evidence is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters. [Citations.] The court's ruling admitting the evidence is reviewed for abuse of discretion. [Citation.]" (*People v. Cordova* (2015) 62 Cal.4th 104, 132.) "A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.] An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citation.]" (*Merriman*, *supra*, 60 Cal.4th at p. 74.)

### 2. Analysis

We find no abuse of discretion in the trial court's admission of the section 1108 evidence concerning C.D. and M.D. based on the trial court's determination that defendant was charged with sexual offenses, that C.D. and M.D.'s testimony was probative of defendant's commission of other sexual offenses, and that the evidence was not inadmissible under section 352. Section 1108 applies when a defendant is accused of a sexual offense, evidence is offered concerning the defendant's commission of another sexual offense or offenses, and the evidence is not inadmissible under section 352. The

16

record supports the trial court's conclusion that these three conditions were satisfied in the instant case.

First, defendant was charged with a "sexual offense," as the term is defined in section 1108, subdivision (d)(1). Defendant's count of sexual penetration of P.D. (Pen. Code, § 289, subd. (e)) while she was intoxicated is listed among the statutory provisions constituting a "sexual offense" under section 1108, subdivision (d)(1)(A). Defendant's count of assault with intent to commit rape and sexual penetration (Pen. Code, §§ 220, subd. (a)(1), 261, subd. (a)(3), (4), 289, subds. (d) & (e)) is also statutorily defined as a "sexual offense" in section 1108, subdivision (d)(1)(B). Defendant does not dispute that he was charged with a "sexual offense" under section 1108. Thus, the first condition for admission of section 1108 evidence was satisfied.

Second, the trial court did not abuse its discretion in determining that the prosecution proffered evidence of defendant's commission of other sexual offenses. C.D. testified that after she declined to perform oral sex on defendant, defendant physically "pulled my head closer down to which I had to push myself off of him." She characterized defendant's physical act as "brutal" and "forced," although she testified that she was not physically bruised or scarred. As the jury was instructed, Penal Code sections 664 and 287, subdivision (c)(2)(A) criminalize attempted forcible oral copulation. A violation of Penal Code section 287 is a listed "sexual offense" under section 1108, subdivision (d)(1)(A), and an attempted violation of Penal Code section 287 is also a "sexual offense" under section 1108, subdivision (d)(1)(F). Thus, "evidence of the defendant's commission of another sexual offense or offenses" was offered. (§ 1108, subd. (a).) Accordingly, the trial court did not abuse its discretion in determining that the proffered testimony of C.D. was sufficient for the jury to find by a preponderance of the evidence that defendant committed a prior sexual offense. (See *Jandres*, *supra*, 226 Cal.App.4th at p. 353.)

17

As to whether this second condition for admissibility of M.D.'s testimony was met, defendant argues that the oral copulation in the car between M.D. and defendant "does not qualify under section 1108 as a nonconsensual sexual contact," asserting that M.D. "did not claim the act was nonconsensual." Defendant also cites the testimony of the defense witness who was present during the acts M.D. described, asserting that this witness's testimony raised "a substantial question whether the acts as alleged by M.D. occurred at all, thereby affecting the probative value to this evidence." We see no abuse of discretion in the trial court's determination that the prosecution offered evidence concerning the defendant's commission of a prior sexual offense or offenses regarding M.D. Concerning the oral copulation that took place in the car, the prosecution asserted that this evidence concerned the alleged offense of oral copulation by force, fear, or threats under Penal Code section 287. M.D. testified that she refused to perform oral sex and only did so after defendant said "you're just gonna do it" and "just lightly padded my head down." Later in the car, she testified, "[t]here were a few times when I brought my head up and he would just bring it back down." M.D. testified that she complied because she "just kind of got scared." This testimony was combined with M.D.'s testimony that the oral copulation took place in a remote setting, that M.D. did not otherwise have access to a ride home, and that M.D. feared defendant and D.A. would release pictures of her performing oral sex if she did not comply. Based on the entirety of M.D.'s testimony, the trial court did not abuse its discretion in determining that the proffered testimony was sufficient for the jury to find, by a preponderance of the evidence, that defendant committed the offense of oral copulation by force, fear, or threats. The validity of the trial court's ruling in this regard is not altered by the testimony of the defense witness who was present in the car that M.D. appeared to act consensually. Despite this witness's testimony, the trial court could nonetheless reasonably conclude that M.D.'s proffered testimony was sufficient to establish the underlying sexual offense by a preponderance of the evidence. The jury was free to believe either M.D.'s account or the defense witness's

18

testimony. In addition, the defense witness's testimony corroborated M.D.'s testimony in some respects, and the defense witness admitted that she initially provided a report to police that was more in line with M.D.'s account. As the trial court stated in its ruling admitting the evidence, the reliability of M.D.'s testimony was a matter for the jury to decide and went to the weight of the evidence, not its admissibility. (See *Merriman*, *supra*, 60 Cal.4th at p. 57.)

With regard to M.D.'s testimony concerning the acts at the park, defendant argues that the testimony of the defense witness who was present raised a substantial question whether these acts took place at all. M.D. testified that after defendant pushed her onto her knees and had her perform oral sex upon him in the park, he then pulled her up, bent her over a bench, and "was rubbing his penis on my butt and then he started putting some pressure on my anus, but there was no penetration." M.D. testified that she repeatedly told defendant she did not want to have anal sex, both before this action and during it. She also testified that she was crying during the oral sex that took place immediately before the actions on the park bench. The prosecution asserted that this evidence concerned the alleged offense of attempted forcible sodomy under Penal Code sections 664 and 286. This qualifies as a "sexual offense" under section 1108, subdivision (d)(1)(A) and (d)(1)(F). Based on the entirety of M.D.'s testimony, the trial court did not abuse its discretion in determining that the proffered testimony was sufficient for the jury to find, by a preponderance of the evidence, that defendant committed the offense of attempted forcible sodomy. While the defense witness who was present at the park testified that the acts in the park did not occur, the trial court could nonetheless reasonably conclude that M.D.'s proffered testimony was sufficient to establish the underlying sexual offense of attempted forcible sodomy by a preponderance of the evidence. Once again, as the trial court stated in its ruling admitting the evidence, the reliability of M.D.'s testimony was a matter for the jury to decide and went to the weight of the evidence, not its admissibility. (See *Merriman*, *supra*, 60 Cal.4th at p. 57.)

19

In addition, the defense witness's testimony corroborated M.D.'s testimony in some respects, such as testifying that defendant did in fact stop at a park (a matter defendant testified did not occur). The defense witness also admitted that she initially provided a report to police that was more consistent with M.D.'s account. Thus, the record demonstrates that the trial court did not abuse its discretion in determining that the second condition for admissibility of section 1108 evidence—that the prosecution proffered evidence of defendant's commission of another sexual offense or offenses—was established with regard to M.D.'s testimony.

Defendant asserts that the testimony from both C.D. and M.D. should not have been admitted because it was not probative of the issue at trial of whether defendant engaged in sexual intercourse with P.D. when he knew or reasonably should have known that she was unable to consent due to her intoxication. However, this is a matter for the trial court to consider in its section 352 balancing, not in the second question of section 1108 evidence's admissibility—whether the prosecution proffered evidence of another sexual offense or offenses. Section 1108 itself contains no requirement that the evidence of another sexual offense or offenses be relevant to the defendant's mental state at issue in the defendant's trial. (See *People v. Erskine* (2019) 7 Cal.5th 279, 296 [under section 1108, evidence showing the defendant's propensity to commit sexual offenses upon which the murder charge and the special circumstance allegations were based was admissible so long as it was not inadmissible under section 352; it was "not necessary to assess the trial court's separate finding that common characteristics between the charged acts and the prior incidents were probative as to identity, deliberation or premeditation" under section 1101, subdivision (b)]; *People v. Frazier* (2001) 89 Cal.App.4th 30, 40–41, fn. omitted ["The charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108."].)

Finally, the trial court did not abuse its discretion in determining that the evidence was not inadmissible under section 352. The trial court stated that it considered the evidence of the alleged prior sexual offenses "highly probative of [d]efendant's sexual misconduct," given similarities the trial court found between the uncharged acts and the charged offenses. The record contains support for the trial court's conclusion that the probative value of the evidence from both C.D. and M.D. was high based on similarities between the prior alleged offenses and the charged offenses. In weighing the section 1108 evidence's probative value, the trial court determines "whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit" the charged offenses. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117.) "As to probative value, ' "[t]he court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered . . . ." ' [Citation.] Put differently, the uncharged sex offense evidence 'must have some tendency in reason to show that the defendant is predisposed to engage in conduct *of the type charged*.' [Citation.] It is true that ' " '[m]any sex offenders are not "specialists," and commit a variety of offenses which differ in specific character.' " ' [Citation.] Nevertheless, ' "multiple sex offenses . . . may be dissimilar enough . . . that the trial court could apply the criteria of section 352 and determine that it is not proper for the jury to consider" ' evidence of an uncharged offense ' "as evidence that the defendant likely committed . . . the other charged offense[]." ' [Citation.]" (*Jandres*, *supra*, 226 Cal.App.4th at pp. 355–356.)

Defendant argues that the section 1108 evidence had no probative value because it did not tend to prove the issue disputed in the charged offenses—whether he knew or reasonably should have known that P.D. was too intoxicated to consent to sexual intercourse. We do not agree. A reasonable juror could conclude that evidence of defendant's prior offenses toward C.D. and M.D. tended to show that he was predisposed

21

to seek to gratify his sexual desires despite the lack of consent from his female companion. The jury could reasonably conclude that this evidence tended to show that defendant engaged in sexual intercourse with P.D. despite her inability to consent. The instances involving P.D., C.D., and M.D. also share some factual similarities. In each of the instances, defendant was alleged to have committed sexual acts in an isolated location, after the alleged victim had consumed alcohol or marijuana, though C.D. did not testify that she was impaired by her marijuana use. With each alleged victim, according to their testimony, defendant began with consensual kissing and then moved on quickly to non-consensual sexual activity. In each situation, the alleged victims testified that they agreed to kissing defendant but did not consent to the further sexual activity that defendant initiated. In each situation, defendant began his alleged sexual offenses soon after one or more persons present departed. While the precise sexual offense defendant was alleged to have committed with P.D. differed from his alleged offenses against C.D. and M.D. in that the prosecution alleged P.D. was unable to consent, the prosecution's evidence showed that defendant's conduct toward C.D. and M.D. constituted sexual offenses that reasonably tended to suggest his predisposition to take advantage of P.D. when she was too intoxicated to consent. Thus, the trial court did not abuse its discretion in determining that the proffered section 1108 evidence had probative value.

Likewise, the record supports the trial court's conclusion that the proffered section 1108 evidence was admissible after considering " 'such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . .' " (*Daveggio and Michaud*, *supra*, 4 Cal.5th at pp. 823–824.) As the trial court noted, the alleged actions toward C.D. and M.D. were not remote in time; they occurred within three years of the charged offenses.

22

Defendant argues that the evidence regarding C.D. had no probative value because he was "15 years old at the time he met with C.D." and he "was sexually immature and had never engaged in either vaginal or oral sex." We do not agree that this argument significantly affects the probative value of C.D.'s testimony, as she testified that defendant used force in an attempt to obtain oral sex after C.D. said no, testimony that is not made irrelevant by defendant's age or sexual inexperience at the time. Defendant testified that despite his age and relative sexual inexperience, he understood the meaning of no in sexual encounters. Thus, the trial court did not abuse its discretion in determining that the lack of remoteness in time weighed in favor of admitting the evidence under section 352.

Defendant argues on appeal that M.D.'s testimony caused undue consumption of time, asserting that M.D.'s testimony comprises more than 100 pages of the reporter's transcript, not counting testimony from defendant and a defense witness to counter M.D.'s testimony. However, M.D.'s testimony—which encompassed about 88 pages of the reporter's transcript—was considerably shorter than the testimony of P.D. A trial minute order indicates that M.D. testified from 9:13 a.m. to 2:40 p.m. on one day of the trial, during which time a morning break, a lunch break and extended arguments concerning the scope of questioning M.D. took place. When placed in the context of this trial that spanned 10 days not including deliberations and the verdict, we cannot say that the trial court's decision that admitting this evidence would not require undue consumption of time was arbitrary, capricious, or patently absurd, resulting in a manifest miscarriage of justice. (See *Merriman*, *supra*, 60 Cal.4th at p. 74.)

Defendant argues that the evidence regarding the uncharged acts was "more inflammatory than evidence of the [defendant's] charged acts." We do not agree. Any risk of undue prejudice concerning defendant's acts toward C.D. and M.D. was limited when compared to the seriousness of defendant's charged conduct toward P.D., and the risk of undue prejudice from the uncharged prior sexual offenses did not significantly

23

outweigh the probative value of those incidents. Defendant also argues that much of M.D.'s testimony involved consensual "salacious" sexual activity that the jury may have been prone to hold against defendant. However, as discussed above, M.D. testified that her oral copulation of defendant in the car and the sexual activity later in the park were both non-consensual. Moreover, the trial court ruled that the prosecution could only call two of the three witnesses listed in the prosecution's section 1108 motion and could not introduce "character evidence of defendant's reputation for being promiscuous with other women," demonstrating that the trial court took factors such as the consumption of time and less prejudicial alternatives into account in its ruling. (See *Daveggio and Michaud*, *supra*, 4 Cal.5th at pp. 823–824.) The record provides no indication that the jurors were misled or confused by the testimony from C.D. and M.D. In addition, the jury was instructed in accordance with CALCRIM No. 1191A that it could only consider the section 1108 evidence if it determined by a preponderance of the evidence that defendant in fact committed the uncharged offenses, that the section 1108 evidence was only one factor to consider, and that the section 1108 evidence was not sufficient by itself to prove that defendant was guilty of the charged offenses. We presume the jurors understood and followed this instruction. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 180.) Thus, we do not agree that the testimony from C.D. and M.D. was so inflammatory as to substantially outweigh its probative value.

Finally, we see no abuse of discretion in the trial court's admission of the section 1108 evidence based on defendant's arguments concerning the evidence's lack of similarity to the charged offenses and the lack of certainty of the prior sexual offenses' commission. As discussed above, the testimony from C.D. and M.D. contained many similarities to the conduct P.D. described, including defendant's initiation of non-consensual sexual conduct soon after the females were placed in an isolated situation. As to the certainty of defendant's commission of the prior sexual offenses, we do not agree with defendant that this factor substantially outweighs the evidence's probative value.

24

The only witness who disputed C.D.'s account was defendant, and defendant's testimony corroborated much of C.D.'s testimony, including that defendant asked C.D. to perform oral sex on him at night soon after defendant's friend left the immediate area, and that he continued to ask for oral sex after she said no. As to M.D., the testimony from the defense witness who was present during the acts M.D. described did not render the prior alleged acts involving M.D. so uncertain as to cause the evidence's probative value to be substantially outweighed by concerns that the conduct did not take place. Again, the defense witness's testimony corroborated much of what M.D. testified to, including that the oral copulation in the car took place and that defendant stopped at a park on the way home. The defense witness was also impeached by her prior inconsistent statements to police in which she provided an account more consistent with M.D.'s testimony.

Taking into account the section 1108 evidence's similarity to the charged offenses, the certainty of the prior sexual offenses' commission, and the remaining considerations under section 352, we conclude that the trial court did not abuse its discretion in determining the evidence was not inadmissible under section 352, as its ruling was not arbitrary, capricious, or patently absurd resulting in a manifest miscarriage of justice. (See *Merriman*, *supra*, 60 Cal.4th at p. 74.) Accordingly, we determine that the trial court did not err in admitting the testimony from C.D. and M.D.[3]

### B. *Correction of Abstract of Judgment*

The abstract of judgment lists defendant's convictions on both counts as violent felonies pursuant to Penal Code section 667.5, subdivision (c). That statute lists several offenses as meeting the definition of "violent felony." Defendant's conviction on count 2 of assault with intent to commit rape and sexual penetration under Penal Code section 220, subdivision (a)(1) is included among the offenses meeting the definition of

---

[3] Because we conclude that the trial court did not abuse its discretion in admitting testimony from C.D. and M.D., we need not evaluate whether the admission of this evidence was harmless error.

a violent felony.  (Pen. Code, § 667.5, subd. (c)(15).)  Defendant's conviction on count 1 of sexual penetration of P.D. when she was intoxicated under Penal Code section 289, subdivision (e) is not listed as a violent felony in Penal Code section 667.5, subdivision (c).  The Attorney General concedes that the abstract is erroneous in designating defendant's conviction on count 1 as a violent felony.  Therefore, we will order correction of the abstract to remove the violent felony designation for defendant's conviction on count 1.

## IV.  DISPOSITION

The abstract of judgment (Judicial Council form CR-290) dated July 22, 2022 is ordered corrected as follows:  item 1 shall be corrected to remove the designation of defendant's conviction on count 1 as a violent felony.  The clerk of the superior court is directed to prepare and transmit to the Department of Corrections and Rehabilitation an amended abstract of judgment.  The judgment is affirmed.

 

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
BROMBERG, J.

***People v. Ryan***
**H050234**